WHEELER ET AL. *v.* BARRERA ET AL.

No. 73-62.   Argued January 16, 1974—Decided June 10, 1974

BLACKMUN, J., delivered the opinion of the Court, in which BURGER, C. J., and BRENNAN, STEWART, POWELL, and REHNQUIST, JJ., joined. POWELL, J., filed a concurring opinion, *post*, p. 428. WHITE, J., filed an opinion concurring in the judgment, *post*, p. 428. MARSHALL, J., concurred in the result. DOUGLAS, J., filed a dissenting opinion, *post*, p. 429.

*Leo Pfeffer* argued the cause for petitioners. With him on the briefs were *Harry D. Dingman* and *James B. Lowe.*

*Thomas M. Sullivan* argued the cause for respondents. With him on the brief were *Edward L. Fitzgerald* and *Louis C. DeFeo, Jr.*

*Deputy Solicitor General Friedman* argued the cause for the United States as *amicus curiae* urging affirmance. With him on the brief were *Solicitor General Bork, Acting Assistant Attorney General Jaffe, Danny J. Boggs, Morton Hollander, John B. Rhinelander, Harry J. Chernock,* and *William A. Kaplin.*[*]

---

[*]*Kenneth W. Greenawalt, Melvin L. Wulf,* and *Walter Wright* filed a brief for the American Civil Liberties Union et al. as *amici curiae* urging reversal.

Briefs of *amici curiae* urging affirmance were filed by *William R. Consedine, George E. Reed, Charles M. Whelan,* and *Alfred L. Scanlan* for the United States Catholic Conference; by *William B. Ball* and *Joseph G. Skelly* for the Catholic League for Religious and Civil Rights et al.; by *Nathan Lewin* for the National Jewish Commission on Law and Public Affairs; and by *James P. Finnegan, Jr.,* for Parents Rights, Inc., et al.

Briefs of *amici curiae* were filed by *Paul S. Berger, Theodore R. Mann, Larry M. Lavinsky, Henry N. Rapaport,* and *Joseph B. Robison* of the American Jewish Congress et al., and by *G. Dennis Sullivan* for the Missouri Coalition for Public Education and Religious Liberty.

MR. JUSTICE BLACKMUN delivered the opinion of the Court.

Title I of the Elementary and Secondary Education Act of 1965, as amended, 20 U. S. C. § 241a *et seq.,* provides for federal funding of special programs for educationally deprived children in both public and private schools.

This suit was instituted on behalf of parochial school students who were eligible for Title I benefits and who claimed that the public school authorities in their area, in violation of the Act, failed to provide adequate Title I programs for private school children as compared with those programs provided for public school children. The defendants answered that the extensive aid sought by the plaintiffs exceeded the requirements of Title I and contravened the State's Constitution and state law and public policy. First Amendment rights were also raised by the parties. The District Court, concluding that the State had fulfilled its Title I obligations, denied relief. The United States Court of Appeals for the Eighth Circuit, by a divided vote, reversed. 475 F. 2d 1338 (1973). We granted certiorari to examine serious questions that appeared to be present as to the scope and constitutionality of Title I. 414 U. S. 908 (1973).

I

Title I is the first federal-aid-to-education program authorizing assistance for private school children as well as for public school children. The Congress, by its statutory declaration of policy,[1] and otherwise, recognized

---

[1] "In recognition of the special educational needs of children of low-income families and the impact that concentrations of low-income families have on the ability of local educational agencies to support adequate educational programs, the Congress hereby declares it to be the policy of the United States to provide financial

that all children from educationally deprived areas do not necessarily attend the public schools, and that, since the legislative aim was to provide needed assistance to educationally deprived *children* rather than to specific schools, it was necessary to include eligible private school children among the beneficiaries of the Act.[2]

Since the Act was designed to be administered by local *public* education officials,[3] a number of problems naturally arise in the delivery of services to eligible private school pupils. Under the administrative structure envisioned by the Act, the primary responsibility for designing and effectuating a Title I program rests with what the Act and the implementing regulations describe as the "local edu-

assistance (as set forth in the following parts of this subchapter) to local educational agencies serving areas with concentrations of children from low-income families to expand and improve their educational programs by various means (including preschool programs) which contribute particularly to meeting the special educational needs of educationally deprived children." 20 U. S. C. § 241a.

[2] The implementing regulations, 45 CFR § 116.1, set forth a number of definitions, some in common with, and others in addition to, the definitions contained in the Act itself, 20 U. S. C. § 244. They draw no distinction between public and nonpublic school children. Specifically:

" 'Educationally deprived children' means those children who have need for special educational assistance in order that their level of educational attainment may be raised to that appropriate for children of their age. The term includes children who are handicapped or whose needs for such special educational assistance result from poverty, neglect, delinquency, or cultural or linguistic isolation from the community at large." 45 CFR § 116.1 (i).

[3] In order for a local Title I proposal to be approved and a grant received, the local agency must give

"satisfactory assurance that the control of funds provided under this subchapter, and title to property derived therefrom, shall be in a public agency for the uses and purposes provided in this subchapter, and that a public agency will administer such funds and property." 20 U. S. C. § 241e (a) (3).

cational agency." [4]   This local agency submits to the "State educational agency" [5] a proposed program designed to meet the special educational needs of educationally deprived children in school attendance areas with high concentrations of children from low-income families. The state agency then must approve the local plan and, in turn, forward the approved proposal to the United States Commissioner of Education, who has the ultimate responsibility for administering the program and dispensing the appropriated and allocated funds.   In order to receive state approval, the proposed plan, among other requirements, must be designed to provide the eligible private school students services that are "comparable in quality, scope, and opportunity for participation to those provided for public school children with needs of equally high priority."   United States Office of Education (USOE) Program Guide No. 44, ¶ 4.5 (1968), [6] repro-

---

[4] "[T]he term 'local educational agency' means a public board of education or other public authority legally constituted within a State for either administrative control or direction of, or to perform a service function for, public elementary or secondary schools in a city, county, township, school district, or other political subdivision of a State, or such combination of school districts or counties as are recognized in a State as an administrative agency for its public elementary or secondary schools.   Such term includes any other public institution or agency having administrative control and direction of a public elementary or secondary school . . . ."   20 U. S. C. § 244 (6)(B).   See also 45 CFR § 116.1 (r).

[5] "The term 'State educational agency' means the officer or agency primarily responsible for the State supervision of public elementary and secondary schools."   20 U. S. C. § 244 (7).   See also 45 CFR § 116.1 (aa).

[6] The regulations state:

"Each local education agency shall provide special educational services designed to meet the special educational needs of educationally deprived children residing in its district who are enrolled in private schools.   Such educationally deprived children shall be

duced in Title I ESEA, Participation of Private School Children—A Handbook for State and Local School Officials, U. S. Dept. of Health, Education, and Welfare, Publication No. (OE) 72–62, p. 41 (1971) (hereinafter referred to as the Handbook).

The questions that arise in this case concern the scope of the State's duty to insure that a program submitted by a local agency under Title I provides "comparable" services for eligible private school children.

## II

Plaintiff-respondents are parents of minor children attending elementary and secondary nonpublic schools in the inner city area of Kansas City, Missouri. They instituted this class action in the United States District Court for the Western District of Missouri on behalf of themselves and their children, and others similarly situated, alleging that the defendant-petitioners, the then State Commissioner of Education and the members of the Missouri Board of Education, arbitrarily and illegally were approving Title I programs that deprived eligible nonpublic school children of services comparable to those offered eligible public school children. The complaint sought an injunction restraining continued violations of the Act and an accounting and restoration of some

provided genuine opportunities to participate therein consistent with the number of such educationally deprived children and the nature and extent of their educational deprivation." 45 CFR § 116.19 (a).

"The needs of educationally deprived children enrolled in private schools, the number of such children who will participate in the program and the types of special educational services to be provided for them, shall be determined, after consultation with persons knowledgeable of the needs of these private school children, on a basis comparable to that used in providing for the participation in the program by educationally deprived children enrolled in public schools." 45 CFR § 116.19 (b).

$13,000,000 in Title I funds allegedly misapplied from 1966 to 1969.

The District Court initially dismissed the complaint on the alternative grounds of failure to exhaust state remedies and abstention. The Court of Appeals reversed this dismissal and remanded the case for trial. 441 F. 2d 795 (CA8 1971). It observed: "[W]e indicate no opinion on the merits of the alleged noncompliance by the state officials." *Id.,* at 801.

On remand, the District Court found that while most of the Title I funds allocated to public schools in Missouri were used "to employ teachers to instruct in remedial subjects," the petitioners had refused "to approve any applications allocating money for teachers in parochial schools during regular school hours." Pet. for Cert. A40. The court did find that petitioners in some instances had approved the use of Title I money "to provide mobile educational services and equipment, visual aids, and educational radio and television in parochial schools. Teachers for after-school classes, weekend classes, and summer school classes, all open to parochial school pupils, have all been approved." *Id.,* at A40–A41.

In what perhaps may be described as something less than full cooperation by both sides, the possibility of providing "comparable" services was apparently frustrated by the fact that many parochial schools would accept only services in the form of assignment of federally funded Title I teachers to teach in those schools during regular school hours. At the same time, the petitioners refused to approve any program providing for on-the-premises instruction on the grounds that it was forbidden under both Missouri law and the First Amendment and, furthermore, that Title I did not require it. Since the larger portion (over 65%) of Title I funds

allocated to Missouri has been used to provide personnel for remedial instruction, the effect of this stalemate is that substantially less money per pupil has been expended for eligible students in private schools, and that the services provided in those schools in no sense can be considered "comparable." [7]

Faced with this situation, the District Court recognized that "[t]his head-on conflict . . . has resulted in an undoubtedly inequitable expenditure of Title I funds between educationally deprived children in public and nonpublic schools in some local school districts in the state." *Id.*, at A41.

Nonetheless, the District Court denied relief. It reasoned that since the petitioners were under no statutory obligation to provide on-the-premises nonpublic school instruction, the failure to provide that instruction could not violate the Act. The court further reasoned that

---

[7] The Court of Appeals noted:

"The practice in Missouri as a whole in prior years has been to give comparable equipment, materials and supplies to eligible private school children, but to exclude any sharing whatsoever of personnel services. Most Title I public school programs in Missouri involve remedial reading, speech therapy and special mathematics classes, thus the largest proportion of the cost of these projects involves salaries for teachers and teacher aids. After the first two years of Title I, expenditures in Missouri for instructional personnel have run from 65 per cent to 70 per cent of the total grant. The remaining funds are used for equipment and materials, health and counseling services, transportation, and plant maintenance. One difficulty with providing only equipment and materials is that even minimal sharing of expenses for equipment and materials soon reaches a saturation point; in fact, the state guidelines permit only 15 per cent of any appropriation to be spent on equipment and instructional materials. The result of this plan for the deprived private school child has been to create a disparity in expenditures in many school districts ranging from approximately $10 to $85 approved for the educationally disadvantaged private school child to approximately $210 to $275 allocated for the deprived public school child." 475 F. 2d 1338, 1345.

since the petitioners apparently had approved all programs "except those requesting salaried teachers in the nonpublic schools," *id.*, at A43, they had fulfilled their commitment. The court did not directly consider whether programs in effect without on-the-premises private school instruction complied with the comparability requirement despite gross disparity in the services delivered.

The Court of Appeals reversed. It traced the legislative history of Title I, examined the language of the statute and the regulations, and noted "that the Act and the regulations require a program for educationally deprived non-public school children that is comparable in quality, scope and opportunity, which may or may not necessarily be equal in dollar expenditures to that provided in the public schools." 475 F. 2d, at 1344. The court then observed that the Act does not mandate that services take any particular form and that, within the confines of the comparability requirement, the Act left to the state and local agencies the task of designing a program best suited to meet the particularized needs of both the public school children and the nonpublic school children in the area. After reviewing the unique situation existing in Missouri, where funds were grossly malapportioned due to the refusal to employ either dual enrollment or Title I teachers on private school premises,[8] the court concluded that the petitioners were in violation of the comparability requirement:

"Thus, we find that when the need of educationally disadvantaged children requires it, Title I authorizes

---

[8] An informal survey conducted by the United States Office of Education revealed that Missouri was the only State which did not use either dual enrollment or on-the-premises private school instruction as a means of providing Title I services. Brief for Respondents 93–95.

special teaching services, as contemplated within the Act and regulations, to be furnished by the public agency on private as well as public school premises. In other words, we think it clear that the Act demands that if such special services are furnished public school children, then comparable programs, if needed, must be provided the disadvantaged private school child." *Id.*, at 1353.

In response to petitioners' argument that Missouri law forbids sending public school teachers into private schools, the court held that the state constitutional provision barring use of "public" school funds in private schools had no application to Title I funds. The court reasoned that although the Act was generally to be accommodated to state law, the question whether Title I funds were "public," within the meaning of the Missouri Constitution,[9]

---

[9] The Missouri Constitution, Art. 9, § 5, provides:

"The proceeds of all certificates of indebtedness due the state school fund, and all moneys, bonds, lands, and other property belonging to or donated to any state fund for public school purposes, and the net proceeds of all sales of lands and other property and effects that may accrue to the state by escheat, shall be paid into the state treasury, and securely invested under the supervision of the state board of education, and sacredly preserved as a public school fund the annual income of which *shall be faithfully appropriated for establishing and maintaining free public schools, and for no other uses or purposes whatsoever.*" (Emphasis supplied.)

The Constitution, Art. 9, § 8, also provides:

"Neither the general assembly, nor any county, city, town, township, school district or other municipal corporation, shall ever make an appropriation or pay from any public fund whatever, anything in aid of any religious creed, church or sectarian purpose, or to help to support or sustain any private or public school, academy, seminary, college, university, or other institution of learning controlled by any religious creed, church or sectarian denomination whatever; nor shall any grant or donation of personal property or real estate ever be made by the state, or any county, city, town, or other

must necessarily be decided by federal law. *Id.*, at 1351–1353. Finally, the court refused to pass on petitioners' claim that the Establishment Clause of the First Amend-

---

municipal corporation, for any religious creed, church, or sectarian purpose whatever."

Finally, the Constitution's Bill of Rights, Art. 1, § 7, provides:

"That no money shall ever be taken from the public treasury, directly or indirectly, in aid of any church, sect or denomination of religion, or in aid of any priest, preacher, minister or teacher thereof, as such; and that no preference shall be given to nor any discrimination made against any church, sect or creed of religion, or any form of religious faith or worship."

In *Special District* v. *Wheeler*, 408 S. W. 2d 60, 63 (1966), the Supreme Court of Missouri held that "the use of public school moneys to send speech teachers . . . into the parochial schools for speech therapy" was not a use "for the purpose of maintaining free public schools," within the meaning of Art. 9, § 5, of the State's Constitution, and therefore was a practice "unlawful and invalid." That case did not involve federal funds.

The question in the present case is whether Title I grants to the State are "donated . . . for public school purposes" and therefore subject to the proscription held to exist in *Special District*. After that case was decided by the Missouri court, the State Board of Education promulgated a regulation governing the use of Title I funds in Missouri. It provides:

" 'Special educational services and arrangements, including broadened instructional offerings made available to children in private schools, shall be provided at public facilities. Public school personnel shall not be made available in private facilities. This does not prevent the inclusion in a project of special educational arrangements to provide educational radio and television to students at private schools.' " See 475 F. 2d, at 1350.

In a formal opinion the Attorney General of Missouri has taken the opposing view, stating: "We do not believe that an appropriation of this type [Title I] converts federal aid into state aid, thereby making it subject to the Missouri constitutional provisions." The opinion concludes:

"It is the opinion of this office that the Elementary and Secondary Education Act of 1965 provides that, under certain circumstances

ment would be violated if Title I, in fact, does require or permit service by public school teachers on private school premises. The reason stated for the court's refusal was that since no plan had yet been implemented, the court "must refrain from passing upon important constitutional questions on an abstract or hypothetical basis." *Id.*, at 1354.

The dissent argued that although Title I permits the assignment of Title I teachers to nonpublic schools, it does not mandate that assignment, and that if the Act is to be read as embracing such a mandate, it would present substantial First Amendment problems that could not be avoided. *Id.*, at 1358–1359.[10]

---

and to the extent necessary, public school personnel, paid with federal funds pursuant to this program, may be made available on the premises of private schools to provide certain special services to eligible children and that Missouri law would not prevent public school personnel, paid with federal funds, from providing these services on the premises of a private school." Op. Atty. Gen. No. 26 (1970).

This rather fundamental intrastate legal rift apparently has resulted in the Missouri Attorney General's nonappearance for the petitioners in the present litigation.

There is no Missouri case in point. Cf. *State ex rel. School District of Hartington* v. *Nebraska State Board of Education,* 188 Neb. 1, 195 N. W. 2d 161, cert. denied, 409 U. S. 921 (1972).

[10] On remand from the Court of Appeals the District Court on May 9, 1973, entered an "Injunction and Judgment Issued in Compliance with Mandate" requiring use of Title I personnel on private school premises during regular school hours if such personnel are also used in public schools during regular school hours. Pet. for Cert. A45–A47. Petitioners appealed from that judgment, but the Court of Appeals dismissed the appeal as moot after we granted certiorari. Our grant of certiorari was to review the judgment of the Court of Appeals entered pursuant to the opinion reported at 475 F. 2d 1338. The judgment of the District Court on remand is not presently before us.

## III

In this Court the parties are at odds over two issues: First, whether on this record Title I requires the assignment of publicly employed teachers to provide remedial instruction during regular school hours on the premises of private schools attended by Title I eligible students, and, second, whether that requirement, if it exists, contravenes the First Amendment. We conclude that we cannot reach and decide either issue at this stage of the proceedings.

A. *Title I requirements.* As the case was presented to the District Court, petitioners clearly had failed to meet their statutory commitment to provide comparable services [11] to children in nonpublic schools. The services provided to the class of children represented by respondents were plainly inferior, both qualitatively and quantitatively, and the Court of Appeals was correct in ruling that the District Court erred in refusing to order relief. But the opinion of the Court of Appeals is not to be read to the effect that petitioners *must* submit and approve plans that employ the use of Title I teachers on private school premises during regular school hours.

The legislative history, the language of the Act, and

---

[11] The Act itself does not mention "comparability." It requires only that the state agency, in approving a plan, must determine "that, to the extent consistent with the number of educationally deprived children in the school district of the local educational agency who are enrolled in private elementary and secondary schools, such agency has made provision for including special educational services and arrangements (such as dual enrollment, educational radio and television, and mobile educational services and equipment) in which such children can participate." 20 U. S. C. § 241e (a)(2). The regulations, 45 CFR §§ 116.19 (a) and (b), are the source of the comparability requirement. See n. 6, *supra.*

the regulations clearly reveal the intent of Congress to place plenary responsibility in local and state agencies for the formulation of suitable programs under the Act. There was a pronounced aversion in Congress to "federalization" of local educational decisions.

"It is the intention of the proposed legislation not to prescribe the specific types of programs or projects that will be required in school districts. Rather, such matters are left to the discretion and judgment of the local public educational agencies since educational needs and requirements for strengthening educational opportunities for educationally deprived elementary and secondary school pupils will vary from State to State and district to district." H. R. Rep. No. 143, 89th Cong., 1st Sess., 5 (1965) ; S. Rep. No. 146, 89th Cong., 1st Sess., 9 (1965).

And 20 U. S. C. § 1232a provides, *inter alia:*

"No provision of . . . the Elementary and Secondary Education Act of 1965 . . . shall be construed to authorize any department, agency, officer, or employee of the United States to exercise any direction, supervision, or control over the curriculum, program of instruction, administration, or personnel of any educational institution, school, or school system . . . ."

Although this concern was directed primarily at the possibility of HEW's assuming the role of a national school board, it has equal application to the possibility of a federal court's playing an overly active role in supervising the manner of Title I expenditures.

At the outset, we believe that the Court of Appeals erred in holding that federal law governed the question whether on-the-premises private school instruction is permissible under Missouri law. Whatever the case might be if there were no expression of specific congres-

sional intent,[12] Title I evinces a clear intention that state constitutional spending proscriptions not be pre-empted as a condition of accepting federal funds.[13]   The key issue,

---

[12] The case from this Court primarily cited by the Court of Appeals for the proposition that federal, not state, law should govern, is *United States* v. *93.970 Acres of Land,* 360 U. S. 328 (1959). There, however, this Court said:

"We have often held that where essential interests of the Federal Government are concerned, federal law rules unless Congress chooses to make state laws applicable.  It is apparent that no such choice has been made here."  *Id.,* at 332–333 (footnotes omitted).

In the present case, Congress, in fact, has made this choice, see n. 13, *infra,* and thus the cited case is not controlling.

[13] During the debates in the House, it was generally understood that state constitutional limitations were to be accommodated.  For example, at one point Congressman Goodell raised the possibility that state law would preclude certain forms of services to nonpublic schools.  The response from Congressman Perkins, Chairman of the Subcommittee, was:

"The gentleman is an able lawyer and he well knows you cannot do anything in this bill that you cannot do under the State law."  111 Cong. Rec. 5744 (1965).

Responding to a later observation by Mr. Goodell that dual enrollment was prohibited by 28 States, Congressman Carey responded:

"The prohibition applies to a single type of program.  That is why we have a multiplicity of programs in this, so that they can choose one in helping the children who are disadvantaged in any one public school."  *Id.,* at 5758.

Congressman Thompson subsequently observed:

"Therefore, the provision about providing full assistance under title I is up to the public school district, subject to the laws of the States."  *Ibid.*

See also *id.,* at 5979 (remarks of Cong. Thompson); *id.,* at 5757 (remarks of Cong. Goodell); *id.,* at 5747 (remarks of Cong. Perkins).

The Handbook clearly recognizes that state law is to be accommodated:

"Many State departments of education found severe restrictions with respect to the kind of services that their respective State

namely, whether federal aid is money "donated to any state fund for public school purposes," within the meaning of the Missouri Constitution, Art. 9, § 5, is purely a ques-

constitutions and statutes allowed them to provide to private school students, especially when those private schools were owned and operated by religious groups.

"The following list illustrates the kind of prohibitions encountered when State constitutions and laws are applied to Title I. The list is not exhaustive.

"* Dual enrollment may not be allowed.

"* Public school personnel may not perform services on private school premises.

"* Equipment may not be loaned for use on private school premises.

"* Books may not be loaned for use on private school premises.

"* Transportation may not be provided to private school students.

"Sometimes such prohibitions exist singly in a given State. Often, the prohibitions exist in combination.

"When ESEA was passed in 1965, each State submitted an assurance to the U. S. Office of Education in which the State department of education stated its intention to comply with Title I and its regulations, and the State attorney general declared that the State board of education had the authority, under State law, to perform the duties and functions of Title I as required by the Federal law and its regulations. While State constitutions, laws, and their interpretations limit the options available to provide services to private school students, this fact, in itself, does not relieve the State educational agency of its responsibility to approve only those Title I applications which meet the requirements set forth in the Federal law and regulations.

"A number of school officials realized that they could not submit the required assurance because of the restrictions applying to private school students which were operative in their States. The impasse was sucessfully [sic] resolved in one case by a State attorney general's opinion which held that State restrictions were not applicable to 100 percent federally financed programs.

"Other States have proposed legislation which would allow the SEA to administer Title I according to the Federal requirements. Still others have applied the restrictions of the State to Title I and have relied upon the initiative of school administrators to develop

tion of state and not federal law. By characterizing the problem as one involving "federal" and not "state" funds, and then concluding that federal law governs, the Court of Appeals, we feel, in effect nullified the Act's policy of accommodating state law. The correct rule is that the "federal law" under Title I is to the effect that state law should not be disturbed. If it is determined, ultimately, that the petitioners' position is a correct exposition of Missouri law, Title I requires, not that that law be preempted, but, rather, that it be accommodated by the use of services not proscribed under state law. The question whether Missouri law prohibits the use of Title I funds for on-the-premises private school instruction is still unresolved. See n. 9, *supra.*

Furthermore, in the present posture of this case, it was unnecessary for the federal court even to reach the issue whether on-the-premises parochial school instruction is permissible under state law. The state-law question appeared in the case by way of petitioners' defense that it could not provide on-the-premises services because it was prohibited by the State's Constitution. But, as is discussed more fully below, the State is not obligated by Title I to provide on-the-premises instruction. The mandate is to provide "comparable" services. Assuming, *arguendo,* that state law does prohibit on-the-premises instruction, this would not provide a defense to respondents' complaint that comparable services are not being provided. The choice of programs is left to the State with the proviso that comparable (not identical) programs are also made available to eligible private school children. If one form of services to parochial school children is rendered unavailable because of state constitutional proscriptions, the solution is to employ an

a program that would meet the Federal requirements." Handbook 19–20.

acceptable alternative form. In short, since the illegality under state law of on-the-premises instruction would not provide a defense to respondents' charge of noncompliance with Title I, there was no reason for the Court of Appeals to reach this issue. By deciding that on-the-premises instruction was not barred by state law, the court in effect issued an advisory opinion. Even apart from traditional policies of abstention and comity, it was unnecessary to decide this question in the current posture of the case.

The Court of Appeals properly recognized, as we have noted, that petitioners failed to meet their broad obligation and commitment under the Act to provide comparable programs.[14] "Comparable," however, does not mean "identical," and, contrary to the assertions of both sides, we do not read the Court of Appeals' opinion or, for that

---

[14] HEW's Office of Education refers to the comparability requirement as follows:

"The needs of private school children in the eligible areas may require different services and activities. Those services and activities, however, must be comparable in quality, scope, and opportunity for participation to those provided for public school children with needs of equally high priority. 'Comparability' of services should be attained in terms of the numbers of educationally deprived children in the project area in both public and private schools and related to their specific needs, which in turn should produce an equitable sharing of Title I resources by both groups of children." USOE Program Guide No. 44, ¶ 4.5 (1968), in Handbook 41–42. See 45 CFR § 116.18 (a).

Title 45 CFR § 116.19 (c) provides:

"The opportunities for participation by educationally deprived children in private schools in the program of a local educational agency under Title I of the Act shall be provided through projects of the local educational agency which furnish special educational services that meet the special educational needs of such educationally deprived children rather than the needs of the student body at large or of children in a specified grade."

See also Handbook 1, 10–11.

matter, the Act itself, as ever requiring that identical services be provided in nonpublic schools.[15]  Congress recognized that the needs of educationally deprived children attending nonpublic schools might be different from those of similar children in public schools; it was also recognized that in some States certain programs for private and parochial schools would be legally impossible because of state constitutional restrictions, most notably in the church-state area.  See n. 9, *supra*.[16]  Title I was not intended to override these individualized state restrictions. Rather, there was a clear intention that the assistance programs be designed on local levels so as to accommodate the restrictions.

Inasmuch as comparable, and not identical, services are required, the mere fact that public school children are provided on-the-premises Title I instruction does not necessarily create an obligation to make identical pro-

---

[15] The Handbook 6, referring to the "comparability" definition in n. 14, *supra,* states:

"Basically, what the regulations and guidelines are saying is this: When a group of children in a private school are found to have a need which is similar (not identical) to a need found in a group of public school children, the response to that need with Title I resources should be similar (not identical) in scope, quality, and opportunity for participation for both groups."

[16] The United States, as *amicus curiae,* states:

"Title I is sufficiently flexible to allow local agencies to observe, where possible, state and local restrictions upon aid to private school children (*e. g.,* prohibition against dual enrollment).  Accordingly, Title I programs may be provided in a different manner to private and to public school children.  For example, remedial services for private school students might be provided outside their regular classroom, while being provided in the regular classroom for public school students.  In addition, the content of the services could differ if the 'special educational needs' required to be met under 20 U. S. C. [§] 241e (a) (1) (A) of the two groups differ." Brief for the United States as *Amicus Curiae* 10 (footnote omitted).

vision for private school children.[17]   Congress expressly
recognized that different and unique problems and needs
might make it appropriate to utilize different programs
in the private schools.   A requirement of identity would
run directly counter to this recognition.   It was antici-
pated, to be sure, that one of the options open to the
local agency in designing a suitable program for private
school children was the provision of on-the-premises
instruction,[18] and on remand this is an option open to

[17] The State, of course, may not utilize the "comparability" pro-
vision so as to provide an inferior program.  A year after the Act
was passed, the House Committee on Education and Labor issued
a Supplemental Report stating:

"While the committee and the Council have emphasized the
importance of adherence to constitutional safeguards, the committee
does not expect that such considerations will be simply a device by
which only a token communication with private school administrators
is extended, or worse yet, by which the projects in which private
schoolchildren can participate are inconvenient, awkwardly arranged,
or poorly conceived.  To the contrary, it is expected that earnest
efforts will be made to ascertain from private school administrators
an accurate appraisal of underachievement and other special needs
of educationally disadvantaged children who do not attend the public
schools.   Projects for such children should be so designed as to
effectively eliminate those factors which preclude the educationally
deprived child from gaining full benefit from the regular academic
program offerings in the private institution in which he or she may
be enrolled." H. R. Rep. No. 1814, pt. 2, 89th Cong., 2d Sess.,
3 (1966).

[18] The Senate Report outlined the circumstances in which this type
of service would be appropriate:

"It is anticipated, however, that public school teachers will be
made available to other than public school facilities only to provide
specialized services which contribute particularly to meeting the
special educational needs of educationally deprived children (such
as therapeutic, remedial or welfare services) and only where such
specialized services are not normally provided by the nonpublic
school." S. Rep. No. 146, 89th Cong., 1st Sess., 12 (1965).  See
45 CFR § 116.19 (e); 111 Cong. Rec. 5747 (1965) (remarks of Congs.
Perkins and Carey).

these petitioners and the local agency.   If, however, petitioners choose not to pursue this method, or if it turns out that state law prevents its use, three broad options still remain:

First, the State may approve plans that do not utilize on-the-premises private school Title I instruction but, nonetheless, still measure up to the requirement of comparability.   Respondents appear to be arguing here that it is impossible to provide "comparable" services if the public schools receive on-the-premises Title I instruction while private school children are reached in an alternative method.   In support of their position, respondents argue: "The most effective type of services is that provided by a teacher or other specialist during regular school hours.   There is nothing comparable to the services of personnel except the services of personnel."   Brief for Respondents 49.   In essence, respondents are asking this Court to hold, as a matter of federal law, that one mode of delivering remedial Title I services is superior to others.   To place on this Court, or on any federal court, the responsibility of ruling on the relative merits of various possible Title I programs seriously misreads the clear intent of Congress to leave decisions of that kind to the local and state agencies.   It is unthinkable, both in terms of the legislative history and the basic structure of the federal judiciary, that the courts be given the function of measuring the comparative desirability of various pedagogical methods contemplated by the Act.

In light of the uncontested statutory proscription in Missouri against dual enrollment, it may well be a significant challenge to these petitioners and the local agencies in their State to devise plans that utilize on-the-premises public school instruction and, at the same time, forgo on-the-premises private school instruction.   We cannot say, however, that this is an impossibility; by relying upon "the initiative of school administrators to

develop a program that would meet the Federal [comparability] requirements," Handbook 20, it may well be possible to develop and submit an acceptable plan under Title I.

Of course, the cooperation and assistance of the officials of the private school are obviously expected and required in order to design a program that is suitable for the private school. It is clear, however, that the Act places ultimate responsibility and control with the public agency, and the overall program is not to be defeated simply because the private school refuses to participate unless the aid is offered in the particular form it requests. The private school may refuse to participate if the local program does not meet with its approval. But the result of this would then be that the private school's eligible children, the direct and intended beneficiaries of the Act, would lose. The Act, however, does not give the private school a veto power over the program selected by the local agency.[19]

In sum, although it may be difficult, it is not impossible under the Act to devise and implement a legal local Title I program with comparable services despite the use of on-the-premises instruction in the public schools but not in the private schools. On the facts of this case, petitioners have been approving plans that do not meet this requirement, and certainly, if public school children continue to receive on-the-premises Title I instruction, petitioners should not approve plans that fail to make a genuine effort to employ comparable alternative programs that make up for the lack of on-the-premises instruction for the nonpublic school children. A program which provides instruction and equipment to the public school

---

[19] "There are no easy solutions to the logistical problems. However, when the legal situation allows several options and good will exists between public and private school representatives, the logistical problem can be solved or reasonably reduced." Handbook 23.

children and the same equipment but no instruction to the private school children cannot, on its face, be comparable. In order to equalize the level and quality of services offered, something must be substituted for the private school children. The alternatives are numerous.[20] Providing nothing to fill the gap, however, is not among the acceptable alternatives.

Second, if the State is unwilling or unable to develop a plan which is comparable, while using Title I teachers in public but not in private schools, it may develop and submit an acceptable plan which eliminates the use of on-the-premises instruction in the public schools and, instead, resorts to other means, such as neutral sites or summer programs that are less likely to give rise to the gross disparity present in this case.

Third, and undoubtedly least attractive for the educationally deprived children, is nonparticipation in the program. Indeed, under the Act, the Commissioner, subject to judicial review, 20 U. S. C. § 241k, may refuse to provide funds if the State does not make a bona fide effort

---

[20] A listing of possible programs suggested to the Senate Committee appears in S. Rep. No. 146, 89th Cong., 1st Sess., 10–11 (1965). Among the examples there listed are teacher aids and instructional secretaries; institutes for training teachers in special skills; supplementary instructional materials; curriculum materials center for disadvantaged children; preschool training programs; remedial programs, especially in reading and mathematics; enrichment programs on Saturday morning and during summer; instructional media centers to provide modern equipment and materials; programs for the early identification and prevention of dropouts; home and school visitors and social workers; supplemental health and food services; classrooms equipped for television and radio instruction; mobile learning centers; educational summer camps; summer school and day camps; shop and library facilities available after regular school hours; work experience programs; Saturday morning special opportunity classes; home oriented bookmobiles; afterschool study centers; and pupil exchange programs.

to formulate programs with comparable services. 20 U. S. C. § 241j.

B. *First Amendment.* The second major issue is whether the Establishment Clause of the First Amendment prohibits Missouri from sending public school teachers paid with Title I funds into parochial schools to teach remedial courses. The Court of Appeals declined to pass on this significant issue, noting that since no order had been entered requiring on-the-premises parochial school instruction, the matter was not ripe for review. We agree. As has been pointed out above, it is possible for the petitioners to comply with Title I without utilizing on-the-premises parochial school instruction. Moreover, even if, on remand, the state and local agencies do exercise their discretion in favor of such instruction, the range of possibilities is a broad one and the First Amendment implications may vary according to the precise contours of the plan that is formulated. For example, a program whereby a former parochial school teacher is paid with Title I funds to teach full time in a parochial school undoubtedly would present quite different problems than if a public school teacher, solely under public control, is sent into a parochial school to teach special remedial courses a few hours a week. At this time we intimate no view as to the Establishment Clause effect of any particular program.

The task of deciding when the Establishment Clause is implicated in the context of parochial school aid has proved to be a delicate one for the Court. Usually it requires a careful evaluation of the facts of the particular case. See, *e. g., Lemon* v. *Kurtzman,* 403 U. S. 602 (1971), and *Tilton* v. *Richardson,* 403 U. S. 672 (1971). It would be wholly inappropriate for us to attempt to render an opinion on the First Amendment issue when no specific plan is before us. A federal court does not sit to

render a decision on hypothetical facts, and the Court of Appeals was correct in so concluding.

The Court of Appeals disposed of the case as follows:

> "The case is remanded to the district court with directions to enjoin the defendants from further violation of Title I of ESEA, and it is further ordered that the court retain continuing jurisdiction of the litigation for the purpose of requiring, within reasonable time limits, the imposition and application of guidelines which will comport with Title I and its regulations. Such guidelines must provide the lawful means and machinery for effectively assuring educationally disadvantaged non-public school children in Missouri participation in a meaningful program as contemplated within the Act which is comparable in size, scope and opportunity to that provided eligible public school children. Such guidelines shall be incorporated into an appropriate injunctive decree by the district court." 475 F. 2d, at 1355–1356 (footnotes omitted).

We affirm this disposition with the understanding that petitioners will be given the opportunity to submit guidelines insuring that only those projects that comply with the Act's requirements and this opinion will be approved and submitted to the Commission. It is also to be understood that the District Court's function is not to decide which method is best, or to order that a specific form of service be provided. Rather, the District Court is simply to assure that the state and local agencies fulfill their part of the Title I contract if they choose to accept Title I funds. Cf. *Lau* v. *Nichols,* 414 U. S. 563 (1974). The comparability mandate is a broad one, and in order to implement the overriding concern with localized control of Title I programs, the District Court should make every effort to defer to the judgment of the petitioners and of

the local agency. Under the Act, respondents are entitled to comparable services, and they are, therefore, entitled to relief. As we have stated repeatedly herein, they are not entitled to any particular form of service, and it is the role of the state and local agencies, and not of the federal courts, at least at this stage, to formulate a suitable plan.

On this basis, the judgment of the Court of Appeals is affirmed.

*It is so ordered.*

MR. JUSTICE MARSHALL concurs in the result.

MR. JUSTICE POWELL, concurring.

The Court holds that under Title I of the Elementary and Secondary Education Act of 1965, as amended, 20 U. S. C. § 241a *et seq.,* federal courts may not ignore state-law prohibitions against the use of publicly employed teachers in private schools, *ante,* at 416–417, that Title I does not mandate on-the-premises instruction in private schools, *ante,* at 419, and that Title I does not require that the services to be provided in private schools be identical in all respects to those offered in public schools. *Ante,* at 420–421. It is thus unnecessary to decide whether the assignment of publicly employed teachers to provide instruction in sectarian schools would contravene the Establishment Clause of the First Amendment. *Ante,* at 415. On that basis, I join the Court's opinion. I would have serious misgivings about the constitutionality of a statute that required the utilization of public school teachers in sectarian schools. See *Committee for Public Education* v. *Nyquist,* 413 U. S. 756 (1973).

MR. JUSTICE WHITE, concurring in the judgment.

As I read the majority opinion, the Court understands well enough that Title I funds are being used in Missouri

to pay the salaries of teachers giving special instruction on public school premises, that the State is obligated to furnish comparable services to private schools, and that the State has not satisfied the comparability requirement. It must do so if it is to continue to use Title I funds in the manner they are now being used.

The Court intimates no opinion as to whether using federal funds to pay teachers giving special instruction on private school premises would be constitutional. It suggests, however, that there may be other ways of satisfying the comparability requirement that the State should consider; and unless the State is being asked to chase rainbows, it is implied that there are programs and services comparable to on-the-premises instruction that the State could furnish private schools without violating the First Amendment. I would have thought that any such arrangement would be impermissible under the Court's recent cases construing the Establishment Clause. Not having joined those opinions, I am pleasantly surprised by what appears to be a suggestion that federal funds may in some respects be used to finance nonsectarian instruction of students in private elementary and secondary schools. If this is the case, I suggest that the Court should say so expressly. Failing that, however, I concur in the judgment.

Mr. Justice Douglas, dissenting.

The case comes to us in an attractive posture, as the Act of Congress is in terms aimed to help "educationally deprived" children, whether they are in public or parochial schools, and I fear the judiciary has been seduced. But we must remember that "the propriety of a legislature's purposes may not immunize from further scrutiny a law which either has a primary effect that advances religion, or which fosters excessive entangle-

ments between Church and State." *Committee for Public Education* v. *Nyquist,* 413 U. S. 756, 774.

All education in essence is aimed to help children, whether bright or retarded. Schools do not exist—whether public or parochial—to keep teachers employed. Education is a skein with many threads—from classical Greek to Latin, to grammar, to philosophy, to science, to athletics, to religion. There might well be political motivation to use federal funds to make up deficits in any part of a school's budget or to strengthen it by financing all or a part of any sector of educational activity.

There are some who think it constitutionally wise to do so; and others who think it is constitutionally permissible. But the First Amendment says: "Congress shall make no law respecting an establishment of religion." In common understanding there is no surer way of "establishing" an institution than by financing it. That was true at the time of the adoption of the First Amendment. Madison, one of its foremost authors, fought the battle in Virginia where the *per capita* minimal levy on each person was no more than three pence. Yet if the State could finance a church at three pence *per capita,* the principle of "establishment" would be approved and there would be no limit to the amount of money the Government could add to church coffers. That was the teaching of his Remonstrance.[1] As Mr. Justice Black stated it, "[n]o tax in any amount, large or small, can be levied to support any religious activities or institutions, whatever they may be called, or whatever form they may adopt to teach or practice

---

[1] Madison's Remonstrance is reprinted in the appendices to *Everson* v. *Board of Education,* 330 U. S. 1, 63 (Rutledge, J., dissenting), and *Walz* v. *Tax Comm'n,* 397 U. S. 664, 719 (DOUGLAS, J., dissenting).

religion." *Everson* v. *Board of Education,* 330 U. S. 1, 16.[2]

Parochial schools are adjuncts of the church established at a time when state governments were highly discriminatory against some sects by introducing religious training in the public schools. The tale has been told often;[3] and there is no need to repeat it here. Parochial schools are tied to the proclamation and inculcation of a particular religious faith—sometimes Catholic, sometimes Presbyterian, sometimes Anglican, sometimes Lutheran, and so on.

The emanations from the Court's opinion are, as suggested by MR. JUSTICE WHITE, at war with our prior decisions. Federal financing of an apparently nonsectarian aspect of parochial school activities, if allowed, is not even a subtle evasion of First Amendment prohibitions. The parochial school is a unit; its budget is a unit; pouring in federal funds for what seems to be a nonsectarian phase of parochial school activities "establishes" the school so that in effect, if not in purpose, it becomes stronger financially and better able to proselytize its particular faith by having more funds left over for that objective. Allowing the State to finance the secular part of a sectarian school's program "makes a grave constitutional decision turn merely on cost accounting and

---

[2] *Everson* was a 5–4 decision sustaining a state law which provided reimbursement to parents of children in sectarian schools for the cost of public bus transportation used by the students in traveling to school, but even the majority recognized that the law went to the "verge" of forbidden territory under the Religion Clauses of the First Amendment. 330 U. S., at 16. Although I was with the majority in that case, I have since expressed my doubts about the correctness of that decision, *e. g., Engel* v. *Vitale,* 370 U. S. 421, 443; *Walz* v. *Tax Comm'n, supra,* at 703.

[3] See *Lemon* v. *Kurtzman,* 403 U. S. 602, 628–629 (DOUGLAS, J., concurring).

bookkeeping entries." *Lemon* v. *Kurtzman,* 403 U. S. 602, 641 (DOUGLAS, J., concurring).

Nor could the program here be immunized from scrutiny under the Establishment Clause by portraying this aid as going to the children rather than to the sectarian schools. See *Committee for Public Education* v. *Nyquist, supra,* at 781 *et seq.* That argument deserves no more weight in the Establishment Clause context than it received under the Equal Protection Clause of the Fourteenth Amendment, with respect to which we summarily affirmed decisions striking down state schemes to circumvent the constitutional requirement of racial integration in public schools granting tuition aid to parents who sent their children to segregated private schools. *Poindexter* v. *Louisiana Financial Assistance Comm'n,* 275 F. Supp. 833, aff'd, 389 U. S. 571, and 296 F. Supp. 686, aff'd, 393 U. S. 17. And see *Griffin* v. *County School Board,* 377 U. S. 218.

The present case is plainly not moot; a case or controversy exists; and it is clear that if the traditional First Amendment barriers are to be maintained, no program serving students in parochial schools could be designed under this Act—whether regular school hours are used, or after-school hours, or weekend hours. The plain truth is that under the First Amendment, as construed to this day, the Act is unconstitutional to the extent it supports sectarian schools, whether directly or through its students.

We should say so now, and save the endless hours and efforts which hopeful people will expend in an effort to constitutionalize what is impossible without a constitutional amendment.