Chief Judge Cooke
(dissenting). Very plainly, the State Constitution does not require that all funds received by the State from the Federal Government be appropriated by the Legislature before they can be spent. The language of section 7 of article VII of the State Constitution is far from clear on its face. Its failure to define what constitutes, money in the State treasury creates an ambiguity that must be resolved through extrinsic factors. The background of the provision, its interpretation by the Legislature and the limitations placed on legislative action in this sphere by the Federal Constitution establish that legislative appropriation of all such funds is not required. I therefore dissent and vote to modify as indicated.
In this action plaintiffs seek a declaration that all funds received from the Federal Government and held in the joint custody of the State Comptroller and the State Commissioner of Taxation and Finance must be appropriated by the Legislature before the funds can be applied to their Federally designated purposes. Plaintiffs maintain that section 7 of article VII of the State Constitution compels this conclusion.
Section 7 of article VII states, in pertinent part, that “ [n] o money shall ever be paid out of the state treasury or *371 any of its funds, or any of the funds under its management, except in pursuance of an appropriation by law.” Although at first glance this provision might appear simple and straightforward, any attempt to apply it immediately reveals its facial ambiguities. In order to determine what money must be appropriated, it is necessary to establish what constitutes money in the State treasury. The Constitution, however, offers no such definition. Without some concrete reference point, the “treasury” mentioned in section 7 of article VII is merely a theoretical label, impossible to apply in practice. This lack of definition raises two issues — how “treasury” should be defined and who should define it.
The plurality, while conceding that not every public fund comes within the constitutional provision (p 360) in essence maintains that it is unnecessary to precisely define the boundaries of the State treasury, because the Comptroller has put these Federal funds into what he considers to be the treasury.[1] Under the plurality’s reasoning, the inquiry would end at this point. Because the Comptroller has chosen to place certain funds received from the Federal Government into joint custody accounts, the plurality in effect asserts that therefore these funds are in the treasury for purposes of the State Constitution’s appropriation requirement. This tautological exercise would permit a bookkeeping decision by a State official to control the meaning of a provision of the State Constitution. The flaws in such a position are obvious. If the Comptroller’s office can determine what money falls within the constitutional appropriation requirement merely by placing the money in a certain type of account, the Comptroller could just as easily circumvent the requirement by placing the money in some other type of account. The meaning of “treasury” could vary from day to day. Certainly the plurality does not intend to sanction such an illogical result.
*372 In attempting to ascertain the meaning of “treasury” in section 7 of article VII, it bears emphasizing that “[i]t is emphatically the province and duty of the judicial department to say what the law is” (Marbury v Madison, 5 US 137, 177; see United States v Nixon, 418 US 683, 705). It is therefore the court’s role to interpret this constitutional provision. In performing this function, this court should consider the intent of the drafters, the provision’s interpretation over the years and the commands of the Federal Constitution and laws.
The provision that is now section 7 of article VII was added to the Constitution in essentially identical form by the Constitutional Convention of 1846. The convention debates show that the purpose of the section was to ensure “that every administration, state and municipal, should collect and pay as it went” (2 Lincoln, Constitutional History of New York, at p 183 [emphasis added]). Without such a provision, one of its sponsors said, “the executive government might go on for years without the legislature, the power and duty to pay all demands against the treasury being vested in the public officers, and if there was no money in the treasury they could go into the market and borrow, and borrow again to repay” (id.). The convention came at a time when “the state’s financial affairs were rapidly approaching a crisis” due to the accumulation of large debts for canal construction (id., at p 81), and adoption of the legislative appropriation requirement was accompanied by adoption of limits on the amount that the Legislature itself could appropriate without approval of the public at large. The purpose of this section, as recognized by this court in the past (see Saratoga Harness Racing Assn. v Agriculture & N. Y. State Horse Breeding Dev. Fund, 22 NY2d 119, 124), was therefore to place greater control over the State government’s ability to incur financial obligations. Courts in other jurisdictions have reached similar conclusions about such constitutional provisions. The Supreme Court of Arkansas found that State’s appropriation requirement was designed “to prevent the expenditure of the people’s tax money without having first procured their consent” (Director of Bur. of Legislative Research v MacKrell, 212 Ark 40, 46).
*373 With this purpose in mind, it is clear that the State Constitution does not require that all Federal funds go through the legislative appropriation process. First, the Federal funds have been raised through Federal taxation, not through the collection of State tax revenues or fees. The allocation of these funds by the State adds no burden to the State’s taxpayers. It is true that much of the Federal money is channeled through programs that require some form of matching State funding. Such matching funds, however, do go through the appropriation process in the Legislature. With regard to the Federal funds, so long as the Federal directives and conditions for spending such funds are followed by State officials, these funds cannot be “overspent”.
The majority expresses concern that without a constitutional appropriation requirement the executive branch “could overspend in anticipation of Federal revenues and would thereby commit the State to obligations which will ultimately have to be met by the State’s taxpayers” (p 364). It is difficult to conceive how requiring legislative appropriation would have any effect on this problem. If the executive branch has “overspent” by incurring greater obligations than are covered by the Federal funds, it has done so either by disregarding the quantitative limits set by the Federal Government or by failing to meet qualitative requirements, as in distributing funds to persons who do not meet a program’s eligibility standards. If the executive branch was going to overspend in such a fashion, it could just as easily disregard or unintentionally misapply directives of the Legislature as it could those of the Federal Government. Requiring legislative appropriation would therefore add no protection against overspending.
Legislative oversight over State expenditures is also a rationale behind the constitutional provision. Construing section 7 of article VII to require legislative appropriation of Federal funds where Congress has designated purposes and conditions would not, however, add any significant oversight to the expenditure of these funds. The Legislature already exerts close control over the scope of programs and projects receiving Federal dollars. For instance, the *374 Legislature has authorized the Department of Health to receive Federal funds for maternal, child care and related health services (Public Health Law, §§ 700-703), has authorized the Industrial Commissioner to enter into agreements with Federal agencies to obtain benefits under a variety of programs (Labor Law, § 21-c), and has directed the method of handling Federal funds for aid to dependent children (Social Services Law, § 358). All that is left to the executive in such instances is the essentially ministerial act of actually implementing the Federal and State legislation governing the programs.
The Legislature’s treatment of Federal funds as they have grown over the years is as instructive as the background of the constitutional appropriation requirement. This treatment leads to only one conclusion — that the Legislature itself has viewed the Constitution as imposing no blanket appropriation requirement on Federal funds merely because they have been placed in a certain type of State account. At the outset, it should be noted that the distribution of Federal funds to the States is not something that has blossomed overnight. To be sure, it was essentially unknown when the constitutional provision was first enacted. Nonetheless, since the Social Security Act of 1935 and other New Deal legislation, Federal funds have been available to the States in significant amounts and these sources of money have grown steadily since that time.
At the time that the Federal money first became available, a legislative committee reviewing fiscal policy recommended that Federal funds be listed in the State budget for the information of the Legislature, but the committee made no mention of any requirement that the money be appropriated by that body (Report of Joint Legis Comm on State Fiscal Policies, NY Legis Doc, 1938, No. 41, p 30). Although, as the majority notes, the 1938 Constitutional Convention rejected an amendment that would have expressly placed all Federal funds outside the general fund of the treasury (see New York State Constitutional Convention, Proposed Amendments, vol I, No. 271, Int 260), neither the proposal nor its rejection can be interpreted as a statement that the Federal funds must be appropriated *375 by the Legislature. This is clear from the passage in 1940 (L 1940, ch 593) of an amendment to the State Finance Law (§ 22, subd d) stating that the Governor’s budget should reflect “moneys * * * not paid into the general fund and not appropriated by the legislature received during the preceding fiscal year by the state or by any department, state institution or other agency of the state by gift, bequest, grant or otherwise, including any moneys from the federal government” [emphasis supplied]. The Legislature thus, in express statutory language, viewed such funds as not subject to appropriation. A similar view of Federal funds as outside the constitutional appropriation requirement was reflected in the 1967 report of the Temporary State Commission on the Constitutional Convention (see Report of Temporary State Commission on Constitutional Convention, 1967, Rep No. 8, State Finance, pp 135, 137-140).
Over the years, the Legislature has acted in a variety of other areas dealing with Federal funding, yet these actions have been consistent with an interpretation of the State Constitution as not requiring legislative appropriation of all such funds. For instance, the Legislature has authorized the Social Services Department to “distribute, reimburse and grant as herein provided the funds appropriated by the legislature for such participation and also such funds as may be received from the federal government for such purpose or purposes” (Social Services Law, § 20, subd 2, par [c] [emphasis added]). The Social Services Department is also authorized to act as agent of Federal relief agencies in the distribution of relief moneys, again without mention of any legislative appropriation requirement (Social Services Law, § 29). Section 11 of the State Finance Law[2] requires legislative approval before. any agency accepts a conditional grant, gift or bequest, but the section explicitly creates a notable exception for conditional Federal grants (see, also, Executive Law, § 539 [grants to *376 Office of Aging]; Education Law, § 270 [grants or gifts to libraries]; Executive Law, § 837 [Federal grants to Division of Criminal Justice Services]).
Although statements by the Legislature could not, of course, overcome a clear constitutional requirement, the statutory expressions here do shed considerable light on the ambiguous provision now before this court.[3] The various statutory enactments,[4] ranging over the lengthy time span in which Federal payments to the States have burgeoned, regardless of the differing political affiliations then dominant in the executive department Dr legislative halls, reflect a consistent interpretation of the State Constitution dramatically at odds with the relatively recent position adopted by plaintiffs here.[5]
The proposition that all funds received from the Federal Government need not be appropriated by the Legislature before expenditure by the State is founded, as well, on the power of Congress and the supremacy clause of the United States Constitution. “The Congress shall have the Power To * * * provide for the * * * general Welfare of the United States” (US Const, art I, § 8) and the “Constitution, and the Laws of the United States which shall be made in Pursuance thereof * * * shall be the supreme Law of the Land” (US Const, art VI, par 2). These provisions were explained *377 in Helvering v Davis (301 US 619): “Congress may spend money in aid of the ‘general welfare’ * * * The line must still be drawn between one welfare and another, between particular and general. * * * The discretion belongs to Congress, unless the choice is clearly wrong, a display of arbitrary power, not an exercise of judgment” (at p 640) and “The issue is a closed one. It was fought out long ago. When [Federal] money is spent to promote the general welfare, the concept of welfare or the opposite is shaped by Congress, not the states” (at p 645).
“[T]he Federal Government * * * may impose the terms and conditions upon which its money allotments to the States shall be disbursed, and * * * any state law or regulation inconsistent with such federal terms and conditions is to that extent invalid”, subject, of course, to constitutional limitations (King v Smith, 392 US 309, 333, n 34; see Boddie v Wyman, 434 F2d 1207, affd 402 US 991; Taylor v Martin, 330 F Supp 85, 87, affd sub nom. Carleson v Taylor, 404 US 980). Stated somewhat differently, “[t]he State’s statutes and regulations may not be construed inconsistently with the Federal statute which controls the disbursement of these funds” (Matter of Boines v Lavine, 44 AD2d 765, 766, cert den 419 US 1040; Townsend v Swank, 404 US 282, 286). Indeed, “[w]ithin the field of its powers, whatever the United States rightfully undertakes, it necessarily has warrant to consummate. And when judicial authority is invoked in aid of such consummation, state constitutions, state laws, and state policies are irrelevant to the inquiry and decision. It is inconceivable that any of them can be interposed as an obstacle to the effective operation of a federal constitutional power” (United States v Belmont, 301 US 324, 331-332; Moscow Fire Ins. Co. v Bank of N. Y. & Trust Co., 280 NY 286, 303, affd 309 US 624 [emphasis added]). There would, of course, be no violation of the supremacy clause if Congress by specific expression “evinces a clear intention that state constitutional spending proscriptions not be pre-empted as a condition of accepting federal funds” (Wheeler v Barrera, 417 US 402, 417; cf. Shapp v Sloan, 480 Pa 449, app dsmd sub nom. Thornburgh v Casey, 440 US 942). Here, however, plaintiffs have not demonstrated or even asserted that any *378 of the funds for which they seek a declaration involves such an expression by Congress.
Quite simply, these basic constitutional principles make it clear that when Federal moneys come to the State burdened with terms and conditions as to how they may be spent by the State, the State must respect those conditions. Appropriation by the Legislature therefore would be an empty gesture, since the Legislature could not contravene the Federal terms. From a practical standpoint, the moneys have been appropriated by the United States Government and general terms for their distribution and use have been fixed. And, where necessary, the Legislature has authorized participation in the Federal programs. Legally, the supremacy clause of the United States Constitution made the provisions of the Federal statutes, operating within the State and pertaining to money grants to the State, as much the policy of the State as if the enactment thereof had emanated from the Legislature (see Mondou v New York, New Haven & Hartford R. R. Co., 223 US 1, 57; Teeval Co. v Stern, 301 NY 346, 365, cert den 340 US 876).
These considerations, when combined with the goals that section 7 of article VII of the Constitution was intended to achieve, make it clear that the requirement of legislative appropriation does not apply to Federal funds simply because the funds are held in the joint custody accounts. This, of course, does not mean that the Legislature could not exert control over the expenditure of Federal funds by the executive through legislation, so long as the legislation does not intrude into the Federal domain and is not inconsistent with the conditions attached to the Federal money (see Moscow Fire Ins. Co. v Bank of N. Y. & Trust Co., 280 NY 286, 303, affd 309 US 624, supra). Likewise, this does not mean that Federal funds given to the State without Federally designated purposes and conditions would not fall under the command of section 7 of article VII. In this regard, it should be noted that Federal revenue sharing funds, which are a general grant, are currently appropriated by the Legislature.
What is involved here, however, is a claim that the State Constitution requires legislative appropriation of all Fed *379 eral funds in joint custody accounts, even though they have already been appropriated once at the Federal level for specific purposes. At the State level, when an option is available to the State, the Legislature has an active role in determining which Federally funded programs the State will join and in establishing the degree of participation. To hold that the Constitution also requires that the Legislature go through the empty gesture of passing these designated funds through a second appropriation process strains the language and rationale of the constitutional provision, and also defies common sense.
In conclusion, the constitutional provision at issue here is unclear and ambiguous. It is therefore necessary for this court to look at the purposes for which the provision was created, the actions of the Legislature since its enactment and the constraints on legislative action in this area created by the Federal Constitution. The strained reading of the provision that the plurality adopts runs counter to all of these considerations. Where Congress has designated a specific purpose and attached terms and conditions to a grant, requiring legislative appropriation creates no greater protection against overspending, does not give the Legislature any greater role in policy decisions than it already has, goes against years of contrary legislative treatment of such funds and is generally a hollow gesture in light of the conditions Congress has attached to the funds. Where a Federal grant did not attach conditions or specify a particular purpose, of course, it would clearly fall within the ambit of the legislative appropriation requirement.[6] This *380 is because of the rationale behind section 7 of article VII of the State Constitution, however, not merely because a State official has labeled such funds as part of the State treasury. Thus, to the degree that the Federal funds in the joint custody accounts have been designated for particular purposes and have been encumbered with general terms and conditions by the Federal Government, the State Constitution does not require appropriation by the Legislature.[7] Furthermore, the plurality and the concurrer essentially disregard the express holding of the Supreme Court in the Wheeler case and a substantial body of State and Federal precedents with respect to Federal supremacy.
For these reasons, I dissent. I do not vote for affirmance, however, because the Appellate Division order declared that the State Constitution “does not require legislative appropriation of Federal funds”. This is too sweeping a statement, encompassing as it does all Federal funds, even those to which Congress may have attached no purpose or conditions whatsoever. Accordingly, I would modify by declaring that section 7 of article VII of the State Constitution does not require appropriation by the Legislature of those moneys received by the State from the Federal Government as to which the Federal Government has designated their purpose and set forth general terms or conditions for use or distribution.
Judges Jones and Wachtler concur with Judge Gabrielli; Judge Jasen concurs in a separate opinion; Chief Judge Cooke dissents and votes to modify in another opinion in which Judges Fuchsberg and Meyer concur.
Order reversed, etc.

. By statute (State Finance Law, § 7) funds in the treasury must be held in the joint custody of the Comptroller and Commissioner of Taxation and Finance. Although it does not inescapably follow that, because treasury funds must be held in joint custody accounts, all joint accounts are therefore in the treasury, the Comptroller does appear to have equated for internal purposes such joint accounts with the treasury.

. Section 11 provides, in pertinent part, that “[n]o gift, grant, devise or bequest, other than grants from the United States, shall hereafter be received or accepted by the state or by any department, board, bureau, or officer thereof without specific statutory authority unless such gift, grant, devise or bequest is unconditional” [emphasis added].

. (Cf. McGowan v Mayor of City of N. Y., 53 NY2d 86, 94.)

. Section 121 of the State Finance Law is not apposite in this regard. Whatever the propriety of the “off budget” treatment of certain State funds, the section is neither indicative nor determinative of the Legislature’s intentions regarding Federal funds. The fact that the Legislature made no express provision for “off budget” treatment of Federal funds received by the State demonstrates nothing. Such an omission could just as easily indicate a legislative assumption that no statute was needed to place Federal funds outside the regular appropriation process, as it could show an intention to include Federal funds within the appropriation process. As previously noted, the exclusion in subdivision d of section 22 of the State Firiance Law of “any moneys from the federal government” from budget appropriation requirements is far more indicative of legislative intent in this area.
Also of significance is section 53 of the State Finance Law, which provides requirements in the event of expenditure of “moneys received by the state * * * which are not appropriated by the legislature.”

. Plaintiffs’ argument that any money placed in what is labeled the State treasury must be appropriated also fails to recognize this court’s holding nearly a century ago in People ex rel. Evans v Chapin (101 NY 682).

. In some situations, of course, it may not be entirely clear at first glance whether a certain grant of Federal money is sufficiently broad or unspecific to require appropriation by the Legislature. In such cases, the purposes and rationale behind section 7 of article VII of the State Constitution will provide guidance. While such an approach may upon occasion require an individual determination with regard to a specific account containing Federal funds, it offers more meaningful guidance than the mere adoption of labels that the plurality in effect approves. Indeed, the impracticality of the plurality’s approach is highlighted by the fact that plaintiffs even include among the Federal funds in the State “treasury” the Federal Withholding Tax Fund, which contains Federal income taxes withheld from State employees pending their payment to the Federal Government. Under the plurality’s rationale, because such tax receipts are in the “treasury” they cannot be forwarded to the Federal Government without first being appropriated by the Legislature.

. The plurality recognizes that the State may not divert Federal funds from the purposes specified by the Federal Government and states that .concern over legislative violation of Federal terms and conditions is “premature” (at p 368, n 12). Certainly there is no reason to assume that the Legislature would violate the Federal conditions. But if the Legislature follows these Federal terms and conditions, its role is confined to acting as a mere rubber stamp, as the plurality in effect concedes (at p 368, n 12).