661 F.2d 598
 Alice DECKER, Patricia Hayes, and Marilyn Z. Hempstead,
Plaintiffs-Appellees,
v.
William F. O'DONNELL, Defendant-Appellant.
Alice DECKER, Patricia Hayes and Marilyn Z. Hempstead,
Plaintiffs-Appellees,
v.
UNITED STATES DEPARTMENT OF LABOR and Ray Marshall,
Secretary of Labor, Defendants-Appellants.
Alice DECKER, Patricia Hayes and Marilyn Z. Hempstead,
Plaintiffs-Appellees,
v.
UNITED STATES DEPARTMENT OF LABOR et al., Defendants,
Candice Warlin et al., Intervening Defendants-Appellants.
 No. 80-1230, 80-1231 and 80-1264.
 United States Court of Appeals,
Seventh Circuit.
 Argued June 11, 1980.
Decided Sept. 9, 1980.
Rehearing and Rehearing En Banc Denied March 2, 1981.
 
 Keith M. Werhan, Civ. Div., Dept. of Justice, Washington, D. C., for defendants-appellants.
 T. Michael Bolger, Quarles & Brady, Milwaukee, Wis., for intervening defendants-appellants.
 Raymond M. Dall'Osto, Milwaukee, Wis., Michael A. Campbell, Winter Haven, Fla., Mary Jo Schiavoni, Wis. Civil Liberties Union Foundation Inc., Milwaukee, Wis., for plaintiffs-appellees.
 Before SWYGERT and WOOD, Circuit Judges, and LARSON,* Senior District Judge.
 SWYGERT, Circuit Judge.
 
 
 1
 In this suit under 42 U.S.C. § 1983 by three federal taxpayers from Wisconsin, the district court issued a nationwide preliminary injunction prohibiting the payment of federal funds for public service employment positions under Title II, Part D of the recently amended Comprehensive Employment Training Act of 1973 ("CETA"), 29 U.S.C.A. §§ 853-59 (1980),[1] in elementary or secondary schools operated by religious or sectarian organizations. The substantive basis for the injunction was that such payment violated the Establishment Clause of the First Amendment to the United States Constitution. On appeal we not only affirm the district court but direct it to make the injunction permanent.[2]
 
 
 2
 Congress re-enacted the public service employment portion of the Comprehensive Employment Training Act of 1973, Pub.L.93-203, 87 Stat. 839 (1973), as amended, 29 U.S.C.A. §§ 801-999 (1980), in 1978 for the purpose of providing economically disadvantaged persons who are unemployed with transitional employment in areas of public service so that those persons can develop job skills and techniques that will enable them to become gainfully employed in the private sector. See 29 U.S.C.A. § 853 (1980); see also 29 U.S.C.A. §§ 801, 841 (1980); 29 C.F.R. § 677.51 (1980). Under this program CETA funds are allocated by the United States Department of Labor among various "prime sponsors," which are primarily state or local governmental units or consortia of local governmental units. See 29 U.S.C.A. §§ 811, 855(a) (1980). The prime sponsors in turn may either hire the CETA participants themselves or subgrant the monies to other governmental entities or eligible private, nonprofit organizations, which then provide employment to the CETA participants. See 29 U.S.C.A. §§ 802(20) & 856 (1980). The only CETA statutory provision regulating placement of CETA recipients in sectarian schools reads as follows:
 
 
 3
 Participants shall not be employed on the construction, operation, or maintenance of so much of any facility as is used or to be used for sectarian instruction or as a place for religious worship.
 
 
 4
 29 U.S.C.A. § 823(a)(2) (1980) (formerly 29 U.S.C. § 848(h)).
 
 
 5
 This action began on October 3, 1978 when plaintiffs filed suit in federal district court against the United States Department of Labor, the Secretary of Labor, and various state and local officials in Wisconsin who were prime sponsors under CETA. The complaint alleged that the defendants' funding of CETA participants as employees of sectarian schools during fiscal year 1978 violated the statutory limitation quoted above, the Establishment Clause, and the Fourteenth Amendment to the United States Constitution. The plaintiffs requested an order requiring the immediate termination of existing CETA grants for recipients employed at sectarian schools, prohibiting future grants, and requiring the defendants to try to recover federal funds already paid to sectarian schools.[3] During the course of the proceedings, all state and local prime sponsors were dismissed from the suit except William O'Donnell, the Milwaukee County Executive;[4] two CETA participants, the Archdiocese of Milwaukee, and four other dioceses in Wisconsin intervened as defendants.[5] In general, factfinding focused on Milwaukee County as a prime sponsor and the Archdiocese of Milwaukee as a subgrantee.
 
 
 6
 In summary, the Archdiocese of Milwaukee first applied to Milwaukee County, the local prime sponsor, for CETA funding for its sectarian schools in 1977. That application and subsequent ones were approved by William O'Donnell, Milwaukee County Executive. In fiscal year 1978 the Archdiocese funded thirty-nine CETA recipients with approximately $329,000 in federal monies. After applying for funding for sixty-two CETA positions in fiscal year 1979, the Archdiocese received approximately $143,000.[6]
 
 
 7
 On July 31, 1979, after consideration of written submissions, the district court entered an order granting plaintiffs' request for a preliminary injunction. On August 17, 1979 the district court stayed the injunction pending appeal, retaining jurisdiction to modify the terms of the injunction. See Fed.R.Civ.P. 62(c). That same day, the Department of Labor published a final, detailed regulation, which took effect September 17, 1979, concerning the use of CETA funds to pay participants working at sectarian schools. 44 Fed.Reg. 48, 185-86 (1979) (to be codified in 20 C.F.R. § 676.71).[7] The district court held an evidentiary hearing and allowed additional written submissions, and on February 12, 1980 issued an order denying the motions of the Department of Labor, its Secretary, and the Archdiocese for amendment and reconsideration of the July 31, 1979 order and dissolving the stay ordered on August 17, 1979.
 
 
 8
 Although the district court dealt with actual past practices in the employment of CETA workers by the Archdiocese in its order of July 31, 1979 and focused on the validity of the September 17, 1979 regulation in its order of February 12, 1980, its analyses on the Establishment Clause issue in its two orders are complementary. First, the court determined that, under current Supreme Court case law, some of the positions funded in the past and some permitted under the regulation would lead by their very nature to excessive entanglement between church and state and unlawful state subsidization of church-related activities. For instance, the Archdiocese had employed CETA workers as reading, mathematics, music, and art teachers. Similarly, the regulation would allow the outstationing of CETA workers as remedial education teachers, their use in connection with speech and hearing therapy performed on school premises, and their use in adult education and recreation programs on school premises operated by sectarian employees. See 20 C.F.R. §§ 676.71(c), (d), & (e)(2), as printed at 44 Fed.Reg. 48, 185 (1979).
 
 
 9
 With respect to other positions involving face-to-face contacts by CETA workers with students in at least a quasi-educational setting, the district court concluded that the potential for abuse would require a monitoring system to ensure that public funds are not used to support religious activities. That system would, however, necessarily entangle the government in the operation of the sectarian schools to an impermissible extent. In connection with this analysis the court noted that the monitoring actually used by Milwaukee County in the past had proved inadequate to prevent the use of CETA funds for religious purposes and that the future monitoring currently planned by Milwaukee County and the Department of Labor would be too entangling.
 
 
 10
 With respect to positions, such as cafeteria workers, which would present little or no opportunity for prohibited religious activity and thus do not require excessive state monitoring, the district court gave two bases for their constitutional infirmity. First, the court found that CETA workers are in essence employees of the Archdiocese. Under the CETA program the Archdiocese hires and fires CETA employees, exercises daily supervision over them, and writes their pay checks. Although CETA workers are thus not government employees, the government is ultimately responsible for paying them. Such direct subsidization of workers providing direct and tangible benefits to religious organizations violates the First Amendment.[8] Alternatively, the district court concluded that the statutory method by which a prime sponsor allocates funds to subgrantees involves a prohibited political entanglement. The public policy decisions will unavoidably become entangled with sectarian and antisectarian concerns, because the process is a competitive one with more groups applying for funds than there are funds available, a single elected public official has the discretion to award funds, and religious organizations are among the possible recipients. According to the court, such impermissible political entanglement renders the whole CETA program unconstitutional.
 
 
 11
 Finally, the district court decided that the preliminary injunction should not be limited to Milwaukee County's CETA programs because "the CETA program, to the extent that it funds employment positions in sectarian schools, is invalid on its face."
 
 
 12
 On appeal the Department of Labor, its Secretary, Milwaukee County Executive William O'Donnell, defendants-intervenors, and amici curiae[9] have presented various arguments for the reversal of the preliminary injunction. The federal defendants have challenged only the portions of the district court's order requiring termination of instructional positions in adult education programs and all noninstructional positions.[10] The federal regulation has been amended accordingly to prohibit the outstationing of CETA workers employed by public entities to provide remedial education services at sectarian schools and the employment by sectarian schools of CETA workers in summer or similar programs with educational components that are open to the general public outside regular school hours.[11] The intervening defendants, however, specifically argue that such positions are permissible and urge us to determine their constitutionality. (Defendants-Intervenors' Brief at 20 n. 5 and 23-28.) Because the federal defendants have represented that they may in the near future reinstate these positions (Federal Appellants' Brief at 39 n. 10), which were deleted only because of the district court's order in this case, see 45 Fed.Reg. 33846 (1980), and because defendants-intervenors, who are full parties in this action, have strongly argued in detail for the validity of this funding, we consider the funding of all positions in the September 17 regulation to be properly before us. See Quern v. Mandley, 436 U.S. 725, 733-34 n. 7 (1978).
 
 
 13
 * In recent years Establishment Clause analysis has become one of the murkier regions of constitutional law. The Supreme Court itself has candidly admitted that it "can only dimly perceive the lines of demarcation in this extraordinarily sensitive area of constitutional law," Lemon v. Kurtzman, 403 U.S. 602, 612, 91 S.Ct. 2105, 2111, 29 L.Ed.2d 745 (1971). The once "high and impregnable" wall between church and state, Everson v. Board of Education, 330 U.S. 1, 18, 67 S.Ct. 504, 513, 91 L.Ed. 711 (1947), has crumbled into a "blurred, indistinct, and variable barrier depending on all the circumstances of a particular relationship." Lemon v. Kurtzman, 403 U.S. at 614, 91 S.Ct. at 2112; Committee for Public Education & Religious Liberty v. Nyquist, 413 U.S. 756, 761 n. 5, 93 S.Ct. 2955, 2959 n. 5, 37 L.Ed.2d 948 (1973).
 
 
 14
 The Supreme Court has, however, erected three "signposts," Hunt v. McNair, 413 U.S. 734, 741, 93 S.Ct. 2868, 2873, 37 L.Ed.2d 923 (1973), that have guided its analysis of alleged contraventions of the Establishment Clause: "(A) legislative enactment does not contravene the Establishment Clause if it has a secular purpose, if its principal or primary effect neither advances nor inhibits religion, and if it does not foster an excessive government entanglement with religion." Committee for Public Education & Religious Liberty v. Regan, 444 U.S. 646, 100 S.Ct. 840, 846, 63 L.Ed.2d 94 (1980); see also Roemer v. Board of Public Works of Maryland, 426 U.S. 736, 748, 96 S.Ct. 2337, 2345, 49 L.Ed.2d 179 (1976).
 
 
 15
 These tests, which are designed to protect against the primary evils of government "sponsorship, financial support, and active involvement of the sovereign in religious activity," Walz v. Tax Commission, 397 U.S. 664, 688, 90 S.Ct. 1409, 1421, 25 L.Ed.2d 697 (1970),[12] have been applied principally in cases considering the constitutionality of state statutes directed at providing various kinds of aid to nonpublic schools or school children. Yet it is clear that the tests are "a product of considerations derived from the full sweep of the Establishment Clause cases," Committee for Public Education & Religious Liberty v. Nyquist, 413 U.S. at 772, 93 S.Ct. at 2965, and that they are to apply in all Establishment Clause cases, see, e. g., Harris v. McRae, 448 U.S. 297, 317, 100 S.Ct. 2671, 2688, 65 L.Ed.2d 784 (1980).[13]
 
 
 16
 The Supreme Court has delineated the content of the tests in various of its opinions. For instance, the effect test has often been restated as a requirement that any nonsecular effect be remote, indirect, and incidental. Meek v. Pittenger, 421 U.S. 349, 359, 95 S.Ct. 1753, 1760, 44 L.Ed.2d 217 (1975); Committee for Public Education & Religious Liberty v. Nyquist, 413 U.S. at 783 n. 39, 93 S.Ct. at 2971 n. 39; see also L. Tribe, American Constitutional Law § 14-9, at 840 (1978). The evil of excessive government entanglement with religion consists of both the excessive administrative surveillance of religious institutions by government sometimes needed to ensure public funds are not used for religious purposes, see, e. g., Meek v. Pittenger, 421 U.S. at 370-72, 95 S.Ct. at 1765-1766; Lemon v. Kurtzman, 403 U.S. at 616-22, 91 S.Ct. at 2113-2115; and the potential for political division along religious lines with respect to governmental aid programs, see, e.g ., Committee for Public Education & Religious Liberty v. Nyquist, 413 U.S. at 794-98, 93 S.Ct. at 2976-2978; Lemon v. Kurtzman, 403 U.S. at 622-24, 91 S.Ct. at 2115-2116. The factors to be considered in determining whether an impermissibility high degree of government administrative surveillance exists are three: "(1) the character and purposes of the benefited institutions, (2) the nature of the aid provided, and (3) the resulting relationship between the State and the religious activity." Roemer v. Board of Public Works of Maryland, 426 U.S. at 748, 96 S.Ct. at 2345; Lemon v. Kurtzman, 403 U.S. at 615, 91 S.Ct. at 2112.
 
 
 17
 A program is not unconstitutional because an excessive degree of government surveillance of religious institutions would be necessary to protect against bad faith diversion to religious purposes of funds limited by the program to secular purposes. Committee for Public Education & Religious Liberty v. Regan, 100 S.Ct. at 850; Wolman v. Walter, 433 U.S. 229, 241-44, 97 S.Ct. 2593, 2602-2603, 53 L.Ed.2d 714 (1977). Yet certain kinds of funding in sectarian schools are prohibited because the form of the aid in the circumstances inherently makes separation of secular and religious aspects impossible without "(a) comprehensive, discriminating, and continuing state surveillance" impermissibly entangling church and state. Lemon v. Kurtzman, 403 U.S. at 616-19, 91 S.Ct. at 2113-2114; Wolman v. Walter, 433 U.S. at 252-55, 97 S.Ct. at 2608-2609; Meek v. Pittenger, 421 U.S. at 367-72, 95 S.Ct. at 1764-1766; Levitt v. Committee for Public Education & Religious Liberty, 413 U.S. 472, 480, 93 S.Ct. 2814, 2819, 37 L.Ed.2d 736 (1973); see also New York v. Cathedral Academy, 434 U.S. 125, 131, 98 S.Ct. 340, 344, 54 L.Ed.2d 346 (1977). Exercise of the utmost good faith by all persons involved to attempt to comply with express restrictions limiting government funding to secular purposes is not enough to save such funding from invalidity under the Establishment Clause.
 
 II
 
 18
 Plaintiffs-taxpayers do not contend that the CETA program lacks a secular legislative purpose.[14] The dispute lies rather in whether or not the placement of CETA workers in these positions in sectarian schools clears the effect and entanglement hurdles of the analysis. Although our analysis of the effect and the administrative entanglement of the placements allowed in the regulation will in the end focus on each of the positions separately, see, e.g., Wolman v. Walter, 433 U.S. at 229, 97 S.Ct. at 2596, we will first consider aspects common to all of the proposed placements.
 
 
 19
 There are at least four common characteristics of all the CETA positions defendants wish to have funded in sectarian schools that are arguably relevant to Establishment Clause effect and administrative entanglement analysis: (1) the sectarian institutions involved are pervasively sectarian elementary and secondary schools; (2) the CETA workers are subject to the daily supervision of the schools and thus can be considered their "employees" and not government employees;[15] (3) the CETA program does not require that public schools receive levels of CETA worker assistance comparable to those enjoyed by sectarian schools; and (4) sectarian schools, at least in Milwaukee County, receive a relatively low proportion of all CETA workers in public service employment.
 
 
 20
 One of the most significant aspects for purposes of both effect and administrative entanglement analysis is the nature of the sectarian institution aided. On the one hand, there are institutions such as religiously affiliated colleges, with "an atmosphere of academic freedom rather than religious indoctrination" where courses are "taught according to the academic requirements intrinsic to the subject matter." Tilton v. Richardson, 403 U.S. 672, 680-82, 91 S.Ct. 2091, 2096-2097, 29 L.Ed.2d 790 (1971). See also Roemer v. Board of Public Works of Maryland, 426 U.S. at 755-59, 96 S.Ct. at 2349-2351; Hunt v. McNair, 413 U.S. at 743-44, 93 S.Ct. at 2874-2875. The secular and religious functions of these institutions can easily be separated, allowing funding of the former functions without requiring an excessively entangling government surveillance. On the other hand, there are institutions the religious aspects of which permeate the whole. See, e. g., Meek v. Pittenger, 421 U.S. at 365-66, 95 S.Ct. at 1763-1764. See generally Freund, Public Aid of Parochial Schools, 82 Harv.L.Rev. 1680, 1688-89 (1969). While it was recently established that some types of direct state aid are permissible for pervasively religious schools, see Committee for Public Education & Religious Liberty v. Regan, supra, it still seems clear that it is much more difficult to segregate a solely secular aspect of such an institution for aid without requiring an impermissibly broad scope of government surveillance.
 
 
 21
 The record reveals that the sectarian schools involved here are pervasively sectarian. They are not religiously affiliated colleges, but Roman Catholic elementary and secondary schools of the character described in Lemon v. Kurtzman, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971); and Meek v. Pittenger, 421 U.S. 349, 371-72, 95 S.Ct. 1753, 1766-1767, 44 L.Ed.2d 217 (1975). For example, in Milwaukee County, the schools function under the direction of the Archdiocese School Administration. At the one major high school, a significant portion of the staff, including the principal, are members of Catholic religious orders; daily mass is offered; and a crucifix is displayed in nearly every classroom. The "Goals and Principles for Schools" and the "Archdiocese Curriculum Guidelines" reveals the schools' affirmative policy to emphasize the Christian and Catholic aspect of the relation between the subjects taught and the outside world. The schools thus understandably and permissibly, and perhaps laudably, have chosen to make religious indoctrination an essential part of their students' educational experience. That choice, however, makes constitutional use of public monies much more difficult.[16]
 
 
 22
 Another fact common to the positions funded here that is relevant to our analysis is the great degree of control that the sectarian schools exercise over CETA workers. The control exercised by sectarian institutions over the public aid has been an important factor in Establishment Clause analysis. For instance, state reimbursement of the costs of teacher-prepared tests was struck down in large part because of the control exercised by the teachers over the content and results of those tests, Levitt v. Committee for Public Education & Religious Liberty, 413 U.S. 472, 93 S.Ct. 2814, 37 L.Ed.2d 736 (1973), while aid for the administration and grading of state-prepared and required tests has been upheld because the sectarian school and its employees did not control the content or results of the largely multiple-choice tests, Committee for Public Education & Religious Liberty v. Regan, 100 S.Ct. at 847; Wolman v. Walter, 433 U.S. at 238-41, 97 S.Ct. at 2600-2602. Thus it is apparent that public employees, not under the direct supervision of sectarian school employees, may constitutionally provide a wider range of services on school premises than can employees of the school itself.[17] See Meek v. Pittenger, 421 U.S. at 371, 95 S.Ct. at 1766; Lemon v. Kurtzman, 403 U.S. at 618, 91 S.Ct. at 2114; cf. Wolman v. Walter, 433 U.S. at 241-44, 97 S.Ct. at 2601-2603 (diagnostic services by public employees approved); Committee for Public Education & Religious Liberty v. Regan, 444 U.S. 646, 100 S.Ct. 840, 63 L.Ed.2d 94 (1980) (reimbursement for limited state test administration, reporting, and recordkeeping by nonpublic school employees approved). In this case the district court found that CETA workers are virtual employees of the Archdiocese of Milwaukee. The Archdiocese makes the hiring and firing decisions, determines their salaries, and supervises the daily work of the workers. Such control exists not during a part of the CETA employee's workday but on a fulltime basis. In most respects, CETA workers are treated indistinguishably from regular Archdiocese school employees.[18]
 
 
 23
 The third and fourth characteristics shared by all the positions under attack that are relevant to effect and administrative entanglement tests can be treated together. Defendants argue that because religious schools comprise a small proportion of the class of subgrantees, the benefit received by the schools is indirect and incidental. Their contention springs originally from language in Walz v. Tax Commission, 397 U.S. 664, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970). In addition, the Court noted in its effect analysis in Nyquist that parochial schools formed eighty percent of the benefited class. Walz and Nyquist do not mean that a program passes muster on these points in the analysis merely because the class benefited is large. In Walz great emphasis was placed on the long and peculiar history of including religious institutions as part of a property tax exemption for all nonprofit institutions and on the entanglements that would result from ending those exemptions. In Nyquist the breadth of the class benefited was only part of the analysis leading to a conclusion of unconstitutionality.[19]
 
 
 24
 In addition, unlike the school aid programs considered by the Supreme Court, there is no requirement that the services provided public schools in the same area be comparable. Indeed, no provision in CETA prohibits assistance to sectarian schools in an area from becoming a substantial proportion of all aid provided.
 
 
 25
 The proper analysis to be undertaken is indicated by Hunt v. McNair, 413 U.S. 734, 93 S.Ct. 2868, 37 L.Ed.2d 923 (1973), which upheld a state program providing for the issuance of state revenue bonds at low interest rates to finance construction of secular facilities at institutions of higher learning in the state.[20] Although it is likely that sectarian institutions constituted a limited portion of beneficiaries of the program, the Court's analysis concentrated on the effect and entanglement caused by the particular grant before it, and especially on the nature of the institution benefited. Thus, considering the significant value of services provided sectarian schools under the CETA program, we think the breadth of the class benefited is not controlling; rather, the effect and entanglement caused by grants to sectarian schools are more important.[21]
 
 III
 
 26
 In the light of this important factual background, we now analyze the constitutionality of the particular positions permitted by the Department of Labor's regulation. The first two types of positions discussed are those originally permitted under the September 17 regulation but now prohibited. The maintenance and clerical positions allowed by some subsections will be discussed together at the end of this Part.A.
 
 
 27
 The outstationing of CETA workers in sectarian elementary or secondary schools for the purpose of providing remedial education services, as permitted under 20 C.F.R. § 676.71(d) of the September 17 regulation, is unconstitutional under Meek v. Pittenger, 421 U.S. 349, 95 S.Ct. 1753, 44 L.Ed.2d 217 (1975), on entanglement grounds. In Meek the Court held that a state's provision of "auxiliary services," including teaching and other services for remedial students, to nonpublic school children by public employees on nonpublic school premises inevitably would require excessive government entanglement with religion even though the permitted services were expressly limited to "secular, neutral, nonideological services." Meek v. Pittenger, 421 U.S. at 367-72, 95 S.Ct. at 1764-1766.
 
 
 28
 The defendants-intervenors respond that the regulation's requirement that the prime sponsor comply with the Elementary and Secondary Education Act ("ESEA") distinguishes this case from Meek. They argue that the ESEA provides restrictions, approved by the Supreme Court in Wheeler v. Barrera, 417 U.S. 402, 94 S.Ct. 2274, 41 L.Ed.2d 159 (1974), that ensure nondiversion of public aid to religious purposes without excessive administrative entanglement. The Court in Wheeler, however, expressly declined to undertake Establishment Clause analysis because the state could implement any of a wide range of possible programs to satisfy its Title I obligations and the constitutionality of its choice would depend on "the precise contours of the plan that is formulated." 417 U.S. at 426, 94 S.Ct. at 2283. In this instance, the specific position proposed is indistinguishable from that expressly overturned by the Court a year later in Meek. That more restrictions are placed upon remedial education teachers here than in Meek does not indicate that the necessary administrative enforcement would be less entangling than that in Meek.[22] We thus conclude that the outstationing of CETA workers to provide remedial education services in these pervasively sectarian schools violates the Establishment Clause.
 
 B.
 
 29
 We next find that the placement of CETA workers in instructional positions in summer or recreation or similar programs at sectarian schools, as permitted under 20 C.F.R. § 676.71(c) of the September 17 regulation, see note 7 supra, is impermissible under the Establishment Clause on administrative entanglement grounds.
 
 
 30
 The Supreme Court has held more than once that public assistance to pervasively sectarian schools for instructional and similar positions that are expressly limited to secular content will inherently require excessive administrative entanglement between state and church. See Lemon v. Kurtzman, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971); Meek v. Pittenger, 421 U.S. 349, 95 S.Ct. 1753, 44 L.Ed.2d 217 (1975); see also Wolman v. Walter, 433 U.S. 229, 97 S.Ct. 2593, 53 L.Ed.2d 714 (1977) (field trips led by teachers).
 
 
 31
 The principal response of defendants-intervenors is that the extensive restrictions placed on CETA workers in such placements by the regulation and Department of Labor Field Memorandum No. 450-79 ensure that the workers will not aid the religious mission of the sectarian school. Initially, we are reluctant to uphold the funding of a position on the basis of a field memorandum that has not been shown to be binding on anyone. We also find that the bulk of the restrictions relied on either do little to ensure that the aid is secular in effect, e. g., the requirements in the regulation that the programs not be offered during regular school hours, or indicate an impermissibly entangling governmental surveillance, e. g., the provision in the field memorandum that CETA workers "be trained by the prime sponsor so as to assure that their activities are free of religious content."[23] Thus we cannot approve the instructional positions now eliminated from the September 17 regulation on the basis of restrictions that fly in the face of Supreme Court holdings that these positions cannot be adequately policed without excessive entanglement.
 
 C.
 
 32
 We see no constitutional distinction between the positions just considered and the instructional positions in adult education programs permitted under 20 C.F.R. § 676.71(c) of the September 17 regulation[24] and thus must overturn them on entanglement grounds.
 
 
 33
 Defendants' principal argument is that because the students are not impressionable elementary and secondary school students, but skeptical adults, the entangling surveillance that we conclude invalidates the other instructional positions is unnecessary in adult education programs.
 
 
 34
 In distinguishing aid to elementary and secondary schools from aid to colleges, the Supreme Court has relied in part on the relative susceptibility of the students to indoctrination. See Tilton v. Richardson, 403 U.S. 672, 686, 91 S.Ct. 2091, 2099, 29 L.Ed.2d 790 (1971). Nevertheless, that reliance does not validate the regulation under scrutiny here. First, the Court has not relied so much on the age of the high school and college students as on their relative mental capacities. There is no guarantee in the regulation that the adult education courses will be pitched at the college level. In addition, the different ages of the students has been only one element in the Court's analysis of the aid to the two levels of education. In Roemer v. Board of Public Works of Maryland, 426 U.S. 736, 764-65, 96 S.Ct. 2337, 2353-2354, 49 L.Ed.2d 179 (1976) (quoting Lemon I in part), the Court described the schools where impermissible entanglement was possible as follows:
 
 
 35
 The elementary and secondary schooling in Lemon I came at an impressionable age; the aided schools were "under the general supervision" of the Roman Catholic diocese; each school had a local Catholic parish that assumed "ultimate financial responsibility" for it; the principals of the schools were usually appointed by church authorities; religion "pervade(d) the school system"; teachers were specifically instructed by the "Handbook of School Regulations" that " '(r)eligious formation is not confined to formal courses; nor is it restricted to a single subject area.' "
 
 
 36
 In the case at bar, where it is not ensured that adult education courses will always match the nondoctrinaire intellectual atmosphere of the colleges approved for aid and where the instructors are substantially under the control of the sectarian schools, we find no constitutional difference based solely upon the age of the students.[25]
 
 D.
 
 37
 We also strike down that part of the regulation allowing the employment of CETA workers in custodial child care after school hours. 20 C.F.R. § 676.71(e) (6). The regulation specifies that the workers are not to provide educational services. However, the line between serving merely as a guardian of the safety of the children and taking a caring, parental role toward one's charges is one that in practice will be virtually impossible for a CETA worker, even in good faith, to observe strictly. Cf. Wolman v. Walter, 433 U.S. 229, 252-55, 97 S.Ct. 2593, 2608-2609, 53 L.Ed.2d 714 (1977); Lemon v. Kurtzman, 403 U.S. 602, 616-19, 91 S.Ct. 2105, 2113-2114, 29 L.Ed.2d 745 (1971). And we cannot distinguish between a child care worker teaching songs to three-year-olds and a nursery school teacher teaching songs to four-year-olds. In a pervasively sectarian school setting where the CETA worker is under the direct supervision of the school, we find that the use of CETA workers in child care positions will inevitably require excessive administrative surveillance to ensure that religion is not furthered.[26]
 
 E.
 
 38
 The regulation also provides for use of CETA workers in "diagnostic or therapeutic speech and hearing services." 20 C.F.R. § 676.71(e)(2). Defendants find support for this regulation primarily in Wolman v. Walter, 433 U.S. 229, 97 S.Ct. 2593, 53 L.Ed.2d 714 (1977), which upheld a statute under which public employees visited nonpublic school premises to provide diagnostic speech and hearing treatment. We think Wolman is distinguishable and find the regulation at bar unconstitutional.
 
 
 39
 Wolman is not sufficient to support public funding of fulltime sectarian school employees working as speech and therapy diagnosticians. Although diagnostic services have little or no educational content and the limited contact a diagnostician has with a child involves "chiefly the use of objective and professional testing methods to detect students in the need of treatment," Wolman v. Walter, supra, 433 U.S. at 244, 97 S.Ct. at 2603, the Supreme Court noted these aspects in part as evidence that "circuit-riding" diagnosticians working for the state would, in their limited visits to sectarian schools, experience little pressure to allow the intrusion of sectarian views. Here in contrast, as stated by federal defendants, "the diagnostician is an employee of the sectarian school whose position is funded under CETA." (Federal Defendants' Brief at 28.) In light of the pervasively sectarian character of the schools involved and the complete immersion of the CETA worker in that environment,[27] we cannot approve this part of the regulation.
 
 
 40
 Given our view of diagnostic services, provision of therapeutic speech and hearing services is also unconstitutional. Additional ground exists for this conclusion. The therapeutic speech and hearing services approved in Wolman were provided by public employees off the school premises and were challenged only insofar as some of the neutral facilities serviced nonpublic school students alone, so that decision's support for this program is indirect at best. In addition, in its discussion of therapeutic services, which included therapeutic speech and hearing services, 433 U.S. at 244 n. 12, 97 S.Ct. at 2603 n.12, the Court explicitly "recognize(d) that, unlike the diagnostician, the therapist may establish a relationship with the pupil in which there might be opportunities to transmit ideological views," 433 U.S. at 247, 97 S.Ct. at 2605. Thus the safeguard of the "limited contact" with the student of the diagnostician is missing with respect to the therapist. The therapist is indistinguishable from a remedial reading teacher, who, although a public employee, was specifically forbidden in Meek v. Pittenger, 421 U.S. 349, 95 S.Ct. 1753, 44 L.Ed.2d 217 (1975). Both treat a learning disability; both control the content of the material used in therapy. We conclude, therefore, that the funding of CETA workers employed in sectarian schools as speech and hearing diagnosticians or therapists violates the Establishment Clause.
 
 F.
 
 41
 The regulation also permits CETA employees to provide services relating to the health and safety of the students. 20 C.F.R. § 676.71(e)(3). Part of that subsection fails to survive effect and entanglement scrutiny.
 
 
 42
 The nursing services permitted do not exclude services treating high school children on matters of sexuality, sexual hygiene, and mental health. Yet the religious overtones of individual moral choice in these areas is clear. We therefore cannot approve the placement of CETA workers as nurses.
 
 
 43
 Under Supreme Court precedent, it is a much closer question whether some of the positions have the primary effect of advancing religion or require excessive administrative surveillance. For instance, support for the employment of CETA workers as attendance clerks is found in Committee for Public Education & Religious Liberty v. Regan, 444 U.S. 646, 100 S.Ct. 840, 63 L.Ed.2d 94 (1980). The Supreme Court there approved a state program that reimbursed nonpublic schools for the costs of keeping and submitting to the state attendance records required by the state law. Id. at 848. Yet the regulation here does not limit CETA worker placement to attendance clerk jobs fulfilling state requirements, so it does not pass constitutional scrutiny as promulgated.
 
 
 44
 Some positions allowed under the regulation assisting on school buses, helping escort children to and from school, and serving as school crossing guards do survive the effect and administrative test under the language of Everson v. Board of Education, 330 U.S. 1, 17, 67 S.Ct. 504, 512, 91 L.Ed. 711 (1947).
 
 
 45
 Thus, some of the nursing and health services provided by the regulation pass the effect and administrative entanglement tests; some do not.[28]
 
 G.
 
 46
 Neither can we approve the Government's desire to place CETA workers in "(f) unctions performed with respect to the administration and grading of State-prepared examinations." 20 C.F.R. § 676.71(e)(5). Appellants rely on Committee for Public Education & Religious Liberty v. Regan, 444 U.S. 646, 100 S.Ct. 840, 63 L.Ed.2d 94 (1980), which held that state reimbursement of nonpublic schools' costs of administering and grading certain state-mandated and prepared tests was constitutional. Regan is insufficient to support the positions desired here. First, Regan noted that the tests involved were state requirements imposed in the exercise of the state's legitimate interest that certain standards of instruction be met in fulfillment of its compulsory education requirement. 100 S.Ct. at 845-46. In the case at bar placements are not limited to involvement with tests required by the state. More importantly, the requirement that the state prepare the tests administered and graded by CETA workers is not sufficient to remove all school control. In Regan the Court examined the tests in detail and determined that the grading function gave the schools no control over the results because the tests consisted either exclusively or largely of multiple choice questions. 100 S.Ct. at 847-48. The regulation here would not prevent the grading by CETA workers under school control of exclusively essay tests with questions on the history of religion in the United States and the role of the church in medieval Europe. Thus the regulation does not foreclose control of test results by the schools and thus fails under the Establishment Cause.
 
 H.
 
 47
 For similar reasons, we strike as unconstitutional that part of the regulation allowing CETA workers to provide "support services for the administration of federally funded or regulated programs made applicable to religious institutions." 20 C.F.R. § 676.71(e)(4). The federal government has nowhere mandated that sectarian schools participate in these programs. In addition, for federal programs available to secular private institutions as well as religious institutions, the statute and regulation do not even assure that the secular institutions will be eligible to receive the services of CETA workers, much less that secular private institutions will receive comparable administrative support.[29]
 
 I.
 
 48
 The regulation also provides for placements in cafeteria work or other work directly related to the provision of food services to students.
 
 
 49
 The Supreme Court has in dictum stated that the provision of school lunches to nonpublic school students was not thought to offend the Establishment Clause. Lemon v. Kurtzman, supra, 403 U.S. 616-17, 91 S.Ct. 2113. See also Wolman v. Walter, supra, 433 U.S. at 242, 97 S.Ct. at 2602; Meek v. Pittenger, supra, 421 U.S. at 364, 95 S.Ct. at 1762.
 
 
 50
 Here, of course, employees, not food, are being funded from public monies. We decline to draw a distinction between food service workers and food analogous to the one drawn by the Supreme Court between teachers and books.[30] Also, no meaningful distinction exists between public provision of food that may be consecrated and public provision of a cafeteria worker who hands over the food to the students for consecration. Thus, the placement of CETA workers in positions in the kitchen passes both the effect and administrative entanglement tests.[31]
 
 J.
 
 51
 The regulation also allows the placement of CETA workers in adjunct custodial or maintenance work related to cafeteria work and health services. Similarly, four categories of placements we have discussed diagnostic or therapeutic speech and hearing services, nursing or health services, federal program support services, and cafeteria work permit CETA workers to perform adjunct clerical services. Only some of these positions pass the effect and administrative entanglement tests.
 
 
 52
 The sole Supreme Court precedent concerning custodial or maintenance work is Committee for Public Education & Religious Liberty v. Nyquist, 413 U.S. 756, 774-80, 93 S.Ct. 2955, 2966-2969, 37 L.Ed.2d 948 (1973), which invalidated a statute authorizing direct payment to nonpublic schools for maintenance and repair work where no restriction existed limiting payments to the upkeep of facilities used exclusively for secular purposes.[32] Although the opinion was based on the absence of restrictions, the Court also indicated that it did not "think it possible within the context of these religion-oriented institutions to impose such restrictions." 413 U.S. at 774, 93 S.Ct. at 2966.
 
 
 53
 Defendants here try to justify the provision of custodial and maintenance services related to cafeteria work on the grounds that food services are necessarily neutral. Special meals at sectarian schools may, however, have explicit religious meaning, e. g., breakfasts in honor of the Archbishop and father/son banquets. On those occasions, especially when the preparation or putting away of religious insignia is necessary, employment of public-funded custodial or maintenance personnel would violate the statute itself and the Establishment Clause. The dining hall becomes a place used for sectarian purposes; this is enough to invalidate public funding of maintenance. See Tilton v. Richardson, 403 U.S. 672, 683, 91 S.Ct. 2091, 2098, 20 L.Ed.2d 790 (1971) (stopping enforcement of restriction against any use of facilities for sectarian purposes built with use of federal construction grant or loan twenty years after completion of building violates the Establishment Clause). Custodial and maintenance personnel must thus be limited to work in the kitchen to be permissible, and the regulation promulgated by the Department of Labor must fail.
 
 
 54
 The defendants try to justify certain other maintenance and repair work on school buildings generally on the grounds that such work is related to the health and safety of the students.[33] Yet virtually all repair work is designed to protect the health and safety of a building's occupants. Thus we think that public funding, through the provision of CETA workers, of safety-related repair work on sectarian school buildings is prohibited under Nyquist.
 
 
 55
 The placement of CETA workers in clerical positions connected with food services, diagnostic and therapeutic speech and hearing services, nursing or health services, and support services in federally funded or regulated programs is unconstitutional to the extent that the underlying functions are unconstitutional. See Parts III (E), (F), (H), and (I) supra. Thus the only clerical services that may potentially pass the effect and administrative entanglement tests are those connected with the cafeteria aspects of food services and safety-related school transportation services. We think that those positions meet the requirement established in Committee for Public Education & Religious Liberty v. Regan, 444 U.S. 646, 100 S.Ct. 840, 848, 850, 63 L.Ed.2d 94 (1980), of being sufficiently discrete and identifiable as well as ministerial and nonideological and thus neither have the primary effect of aiding religion nor require excessive administrative surveillance. See note 31 supra.
 
 IV
 
 56
 Although some particular positions pass the effect and administrative entanglement tests, all placement of CETA workers in sectarian schools is prohibited under the Constitution because the structure of decisionmaking about funding creates an impermissible risk of political entanglement for the CETA program as a whole.
 
 
 57
 Since Mr. Chief Justice Burger's opinion in Lemon v. Kurtzman, 403 U.S. 602, 622-24, 91 S.Ct. 2105, 2115-2116, 29 L.Ed.2d 745 (1971), the Supreme Court has often analyzed aid to sectarian schools in terms of its potential for divisive political conflict over the issue of funding. Committee for Public Education & Religious Liberty v. Regan, 444 U.S. 646, 100 S.Ct. 840, 850 n.8, 94 L.Ed.2d 63 (1980); Roemer v. Board of Public Works of Maryland, 426 U.S. 736, 749 & n.16, 765-66, 96 S.Ct. 2337, 2346 n.16, 2353-2354, 49 L.Ed.2d 179 (1976); Meek v. Pittenger, 421 U.S. 349, 372, 95 S.Ct. 1753, 1766, 44 L.Ed.2d 217 (1975); Committee for Public Education & Religious Liberty v. Nyquist, 413 U.S. 756, 794-98, 93 S.Ct. 2955, 2976-2978, 37 L.Ed.2d 948 (1973). "Ordinarily political debate and division, however vigorous or even partisan, are normal and healthy manifestations of our democratic system of government, but political division along religious lines was one of the principal evils against which the First Amendment was intended to protect." Lemon v. Kurtzman, 403 U.S. at 622, 91 S.Ct. at 2115 (quoted in Committee for Public Education & Religious Liberty v. Nyquist, 413 U.S. at 796 n. 54, 93 S.Ct. at 2977 n.54. Such division would, contrary to our history, "confuse and obscure other issues of great urgency." Lemon v. Kurtzman, 403 U.S. at 622-23, 91 S.Ct. at 2115-2116.[34]
 
 
 58
 In this particular case, we agree with the district court that CETA's statutory funding mechanism presents a serious potential for political divisiveness that invalidates the placement of CETA workers in primary and secondary sectarian schools. The Department of Labor determines the amount of funds available to any particular prime sponsor and thus limits the number of CETA workers a prime sponsor may fund. There is much competition for services of CETA workers among potential subgrantees, and no limit exists to the number of workers any subgrantee may receive. The amount of funds available is sizeable ten million dollars in fiscal year 1979 for Milwaukee County alone. As in Lemon v. Kurtzman, supra, 403 U.S. at 623, 91 S.Ct. at 2116, the potential for political divisiveness in this competition is aggravated by the annual nature of the funding received by subgrantees, which "provides successive opportunities for political fragmentation and division along religious lines," Meeks v. Pittenger, supra, 421 U.S. at 372, 95 S.Ct. at 1766. The CETA program is also beset by the likelihood, as illustrated in Milwaukee by the dramatic increase in the Archdiocese's request from 1978 to 1979, see text at n.6 supra, that sectarian schools will increase the size of their requests for CETA worker services. Lemon v. Kurtzman, supra, 403 U.S. at 623, 91 S.Ct. at 2116. In addition, the student constituencies of the schools are concentrated in the area, creating a large degree of dependence of the schools on the church. See Roemer v. Board of Public Works of Maryland, supra, 426 U.S. at 765-66, 96 S.Ct. at 2353-2354.
 
 
 59
 The potential for political divisiveness is further enhanced by the Act's requirement that local decisions be made only after a profusion of comment from the local community. See 29 U.S.C.A. §§ 813-14, 818-20 (1980). For instance, a prime sponsor must make arrangements to "ensure the participation of and consultation with local educational agencies, vocational education agencies, community-based organizations, Federal and State agencies, organized labor, business, and other institutions and organizations in the conduct of programs under this chapter." 29 U.S.C.A. § 813(a)(9) (1980). In addition, CETA requires that the prime sponsor set up a planning council, consisting of representatives of various local groups and organizations, which makes recommendations on funding decisions to the prime sponsor. 29 U.S.C.A. § 819 (1980). The prime sponsor must also make his funding decisions available to the general public and to various local groups for review and comment before final submission of the decisions to the Secretary of Labor. See 29 U.S.C.A. §§ 814(a) & (b) (1980).
 
 
 60
 It is also significant that the prime sponsor, which has final responsibility for local funding decisions, 29 U.S.C.A. § 819(e) (1980), has a wide degree of discretion in choosing among eligible subgrantee applicants. This characteristic clearly distinguishes this case from National Coalition for Public Education & Religious Liberty v. Harris, 489 F.Supp. 1248 (CHT) (S.D.N.Y.1980) (three-judge court), where local education officials distributing funds were to make grants on a per capita basis to benefit developmentally disadvantaged children in both public and private schools. Although local political pressures could not affect the funding in Harris, such pressures by those favoring and opposing the provision of CETA workers to sectarian schools could be decisive and therefore the potential for political divisiveness is enormous.
 
 
 61
 Although Supreme Court political entanglement analysis has thus far focused on potential political conflict at the state level, the same reasoning should apply at a local level. Indeed, the Court's original articulation of political entanglement analysis spoke in terms of political division in "States or communities" along religious lines. See Lemon v. Kurtzman, supra, 403 U.S. at 622, 91 S.Ct. at 2115. Furthermore, because small groups may more easily exert themselves politically at a local level, funding decisions made locally will more likely become the seed of the political conflict based on religion.[35]
 
 
 62
 Thus we conclude that all placement of CETA workers in sectarian schools violates the Establishment Clause because the statutory funding allocation mechanism creates too great a potential for political divisiveness along religious lines.[36]
 
 V
 
 63
 Appellants contend that because factfinding focused on Milwaukee County, the district court erred in entering a nationwide injunction. This case has evolved, however, from one challenging the functions CETA workers actually performed in sectarian schools in Wisconsin into one challenging the facial constitutionality of the statute and of the Department of Labor's September 17 regulation. Thus our analysis has relied primarily on the statute and regulation and has used the evidence on funding in Milwaukee County merely as illustration.[37]
 
 
 64
 The two CETA workers who have intervened as defendants contend that the prohibition against placing CETA employees in sectarian schools violates their rights under the Free Exercise Clause. The CETA employment of these persons had ended before the district court's entry of a preliminary injunction, so their rights were not violated. Nevertheless, CETA does not discriminate against any CETA worker on the basis of his or her religion. CETA applicants of all creeds are eligible for benefits; employers may not discriminate against an applicant on the basis of religion. The program, as confined by this opinion, merely will not place an applicant in a job in a sectarian school. We do not believe, and defendants-intervenors cite no authority, that having a CETA position in a sectarian school is an exercise of one's religious beliefs.
 
 
 65
 In addition to injunctive relief, plaintiffs' complaint seeks an order to require the government defendants to try to recover federal funds already paid to sectarian schools. Cf. New York v. Cathedral Academy, 434 U.S. 125, 98 S.Ct. 340, 54 L.Ed.2d 346 (1977); Lemon v. Kurtzman, 411 U.S. 192, 93 S.Ct. 1463, 36 L.Ed.2d 151 (1973) (Lemon II). None of the parties has briefed that issue, so we remand it, along with the question of plaintiffs' attorney fees, costs, and disbursements, for initial consideration by the district court.
 
 
 66
 For all the foregoing reasons, the district court's order is affirmed. Further, that court is directed to make its injunction permanent, and the case is remanded for further proceedings consistent with this opinion.
 
 
 67
 Affirmed and Remanded.
 
 
 
 *
 The Honorable Earl R. Larson, Senior District Judge of the District of Minnesota, is sitting by designation
 
 
 [1]
 On October 27, 1978 the original 1973 Act was substantially amended by the Comprehensive Employment Training Act Amendments of 1978, Pub.L.No.95-524, 92 Stat. 1956. The complaint in this action and the district court speak in terms of Title II of the original Act, which concerned public service employment programs. See Comprehensive Employment Training Act of 1973, Pub.L.No.93-203, Title II, 87 Stat. 839, 850-57, 29 U.S.C. §§ 841-51 (1976). That Title was reenacted in substance, with changes not relevant here, as Title II, Part D of the new Act. See S.Rep.No.891, 95th Cong., 2d Sess., reprinted in (1978) U.S.Code Cong. & Ad.News 4480, 4482, 4484, 4509-10
 
 
 [2]
 The parties agreed at oral argument to a review on the merits of the facial constitutionality of the Act to the extent it allowed payments to sectarian schools and of the facial constitutionality of the regulations on this issue that was recently promulgated
 
 
 [3]
 The plaintiffs also requested an order requiring defendants to pay plaintiffs' attorney fees, costs, and disbursements
 
 
 [4]
 The dismissed prime sponsors, except one who was never served with notice of this lawsuit, were apparently dismissed by stipulation after agreeing to discontinue placement of CETA participants in sectarian schools
 
 
 [5]
 Those four were the dioceses of Green Bay, Madison, LaCrosse, and Superior
 
 
 [6]
 In fiscal year 1979 the Department of Labor allocated approximately ten million dollars in CETA funds to Milwaukee County
 
 
 [7]
 This regulation specified that no CETA participant could be employed by a sectarian school to perform the functions of a teacher, librarian, guidance counselor, janitor or maintenance worker, clerical worker, or teacher aide unless he or she fit into the following specific exceptions:
 (c) Religiously affiliated elementary or secondary schools, may, subject to supervision by the prime sponsor, employ participants in programs such as adult education, recreation, summer programs or other similar activities including remedial tutorial activities, provided that such programs are not offered during regular school hours, are not a part of the regular school curriculum (including summer school), are open to the community at large, and in which the community is encouraged to participate, and provided further that such programs do not involve religious activities.
 (d) Nothing in this section shall preclude a prime sponsor or a subrecipient other than a religious organization from outstationing a participant to a religiously affiliated elementary or secondary school for the purpose of providing remedial education services, provided that such services do not involve religious activities and provided further that the prime sponsor or subrecipient complies with the Elementary and Secondary Education Act, 20 U.S.C. § 241(e), and the regulations thereunder at 20 C.F.R. §§ 1801 et seq.
 (e) Participants may be employed by a religiously affiliated elementary or secondary school in the following capacities, or performing functions characteristic of these capacities:
 (1) Cafeteria work or other work directly related to the provision of food services to students including clerical, custodial or maintenance work related to such services.
 (2) Diagnostic or therapeutic speech and hearing services including clerical work related to such services.
 (3) Nursing or health services or any other activities relating to the health or safety of students (e. g., assisting on school buses or in escorting children to and from school, acting as attendance clerks or school crossing guards, removing asbestos hazards or performing other similar emergency service relating to the health or safety of students), including clerical work related to such services.
 (4) Any functions (including secretarial or clerical activities) where such activities are limited to providing support services for the administration of federally funded or regulated programs made applicable to religious institutions.
 (5) Functions performed with respect to the administration and grading of State-prepared examinations.
 (6) Custodial child care after school hours provided the participant is not providing educational services.
 
 
 [29]
 C.F.R. §§ 676.71(c), (d), (e), as printed at 44 Fed.Reg. 48, 185-86 (1979). Under the regulation, the Secretary was also permitted to consider on a case-by-case basis applications for participation in programs other than those specifically set out. 29 C.F.R. § 676.71(f), as printed at 44 Fed.Reg. 48, 186 (1979). After the district court's order of February 12, 1980, the Secretary amended the regulation in various ways. See note 11 infra
 
 
 [8]
 The district court labeled this ground as one of excessive administrative entanglement; we believe it to state a violation of the primary effect test. See Part I infra
 
 
 [9]
 This court has allowed two amicus briefs to be filed: One on behalf of the Catholic Bishop of Chicago, the other on behalf of the Agudath Israel of America, the National Jewish Commission on Law and Public Affairs, the National Council of Young Israel, Torah Umesorah, and the Union of Orthodox Jewish Congregations of America
 
 
 [10]
 The federal appellants do not concede the unconstitutionality of the placements they have not appealed. (Federal Appellants' Reply Brief at 3 n. *.)
 
 
 [11]
 The amended regulation deleted subsection 676.71(d) entirely, causing a relettering of subsections (e) and (f) to (d) and (e), and modified subsection 676.71(c) to read as follows:
 (c) Religiously affiliated elementary or secondary schools, may, subject to supervision by the prime sponsor, employ participants in programs such as adult education, or summer or other programs providing custodial child care or recreational activities which do not involve educational components such as those commonly included in the educational curriculum of elementary and secondary schools (including remedial tutorial activities), provided that such programs are not offered during regular school hours, are not a part of the regular school curriculum (including summer school), are open to the community at large, and in which the community is encouraged to participate, and provided further that such programs do not involve religious activities.
 
 
 [29]
 C.F.R. § 676.71(c), as printed at 45 Fed.Reg. 33889 (1980). We shall refer to the subsections under review by their original lettering in the September 17 regulation
 
 
 [12]
 See also Meek v. Pittenger, 421 U.S. at 359, 95 S.Ct. at 1760; Committee for Public Education & Religious Liberty v. Nyquist, 413 U.S. at 772, 93 S.Ct. at 2965
 
 
 [13]
 Some defendants and one amicus appear to argue that because CETA is a general welfare program and not a statute directed to providing aid to nonpublic schools, we should employ a less stringent standard of review. Although, of course, the CETA program is to be judged on its own merits and not on those of any other school aid program, the same three-part test applies
 
 
 [14]
 Nevertheless, on this point defendants repeatedly contrast the CETA program, a federal welfare program intending to help the nation's unemployed, with state programs designed to aid private schools. It is irrelevant whether CETA may be "more" secular than the state school aid programs. Both types of programs have a secular legislative purpose and therefore satisfy the first of the three tests
 
 
 [15]
 CETA workers outstationed at sectarian schools pursuant to 20 C.F.R. § 676.71(d) would likely not be subject to the same degree of school control
 
 
 [16]
 Defendants-intervenors contend that the schools in this case are not "pervasively sectarian" under Lemon v. Kurtzman, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), but instead resemble the schools in Wolman v. Walter, 433 U.S. 229, 97 S.Ct. 2593, 53 L.Ed.2d 714 (1977). See National Coalition for Pub. Educ. & Relig. Liberty v. Harris, 489 F.Supp. 1248 at 1262-1263 (CHT), (S.D.N.Y.1980). Even assuming that the schools here resemble those in Wolman more than those in Lemon, we do not note any significant difference in the analysis applied in Wolman, see, e. g., 433 U.S. at 234-35 & n. 4, 254, 97 S.Ct. at 2598-2599 & n.4, 2608, and neither have the Justices of the Supreme Court, see Committee for Pub. Educ. & Relig. Liberty v. Regan, 444 U.S. 646, 100 S.Ct. 840, 853, 63 L.Ed.2d 94 (1980)
 The fact that schools are the institutions benefited, as well as their pervasively sectarian character, clearly distinguishes this case from Bradfield v. Roberts, 175 U.S. 291, 20 S.Ct. 121, 44 L.Ed. 168 (1899), in which the Supreme Court permitted the use of public monies to finance the construction of hospital buildings to be operated by religious orders.
 
 
 [17]
 It is clear, nonetheless, that services are not automatically constitutional when public employees provide them on school premises. Meek v. Pittenger, 421 U.S. at 367-72, 95 S.Ct. at 1764-1766
 
 
 [18]
 Defendants attack this finding primarily on the ground that the CETA program establishes certain guidelines, especially as to hiring, that vitiate much of the schools' discretion in control. See 29 U.S.C.A. §§ 824 & 858 (1980). Although the schools do not have the complete discretion they may have with respect to their other employees, we conclude that the district court's finding that the schools exercise substantial control over CETA workers not to be clearly erroneous
 
 
 [19]
 Americans United for Separation of Church & State v. Blanton, 434 U.S. 803, 98 S.Ct. 39, 54 L.Ed.2d 65 (1977), aff'g 433 F.Supp. 97 (M.D.Tenn.) (three-judge court), also cited by defendants is distinguishable. In that program, which granted state financial assistance to college students on the basis of need, the individual students could choose to attend any accredited college in the state. Here by contrast the prime sponsor, a governmental unit, and not the CETA worker selects the institutions that receive the benefit of CETA worker services
 
 
 [20]
 The only institutions ineligible for assistance were schools of divinity for particular denominations. See Hunt v. McNair, supra, 413 U.S. at 736-37, 93 S.Ct. at 2870-2871
 
 
 [21]
 The defendants also note that the statute requires that all services provided employers, including sectarian schools, under CETA be supplemental in character. 29 U.S.C.A. § 823(e)(2) (1980). Thus the employment of CETA workers does not free other funds of the school for expenditure on religious purposes, which is itself not enough for a constitutional violation. Committee for Public Education & Religious Liberty v. Regan, 100 S.Ct. at 849; New York v. Cathedral Academy, 434 U.S. at 125, 98 S.Ct. at 341; Roemer v. Board of Public Works of Maryland, 426 U.S. at 747, 96 S.Ct. at 2345; Hunt v. McNair, 413 U.S. at 743, 93 S.Ct. at 2874. At the constitutional level, however, it is not significant whether the services provided or reimbursed are necessary to school operation, or supplemental. Cf. Committee for Public Education & Religious Liberty v. Regan, 100 S.Ct. at 852-54 (dissent based in part on fact that reimbursed services were necessary to operation of school)
 Plaintiffs-appellees question whether some of the positions funded would be supplemental. See note 29 infra.
 
 
 [22]
 We note further that, as in Levitt v. Committee for Public Education & Religious Liberty, 413 U.S. 472, 480, 93 S.Ct. 2814, 2819, 37 L.Ed.2d 736 (1973), neither CETA nor its regulation establishes any enforcement mechanism for these restrictions
 ESEA does have a comparability requirement, 20 U.S.C. § 2740(a), and thus makes this position unlike the others included in the regulation. However, the statute in Meek did provide that the auxiliary services provided to nonpublic school children should consist of those provided to public school children. Meek v. Pittenger, 421 U.S. at 352 n.2, 95 S.Ct. at 1756 n.2. In addition, CETA regulations establish no mechanism for enforcing the comparability requirement.
 
 
 [23]
 The federal defendants contend that this restriction will not require the prime sponsor to define "religious content" for the CETA workers. The regulation, they argue, determines which jobs are religious and which are secular. The training of CETA workers contemplated in the field memorandum will merely aim at enabling CETA workers to realize when they are being asked to perform functions outside their job description. The restriction itself, along with its accompanying comment, does not, however, easily lend itself to the interpretation contended for by defendants
 
 
 [24]
 These positions are still permitted under the revised regulation. See note 11 supra
 
 
 [25]
 Federal defendants seek to preserve placements in recreational programs that have no instructional component. We are not convinced that the government can segregate the instructional aspects of recreation, where many of life's lessons about morality and socialization are taught, many more easily than in the classroom. Thus we strike down that provision as impermissibly entangling
 
 
 [26]
 We further note that the regulation does not forbid the schools to limit the availability of these child care services to parishioners
 
 
 [27]
 See Meek v. Pittenger, 421 U.S. 349, 95 S.Ct. 1753, 44 L.Ed.2d 217 (1975) (provisions of counseling services by public employees in nonpublic schools struck down because of the pervasively sectarian character of the schools); see also Wolman v. Walter, 433 U.S. at 247-48, 97 S.Ct. at 2605-2606
 Our invalidation of the funding of diagnosticians is further supported by the facts that the regulation has no severability clause, see Meek v. Pittenger, supra, 421 U.S. at 371 n.21, 95 S.Ct. at 1766 n.21, and that CETA employees working fulltime in sectarian schools as diagnosticians will almost inevitably lapse into providing therapeutic services.
 
 
 [28]
 The positions satisfying the effect and administrative entanglement tests are, nonetheless, unconstitutional on the ground of political entanglement. See Part IV infra
 
 
 [29]
 Because we find this subsection unconstitutional, we need not consider plaintiffs' argument that providing federal program support services, which are by their nature necessary for participation in those programs, violates the statutory requirement that no CETA employee fill a position that would otherwise be filled by a regular employee of the subgrantee. See 29 U.S.C.A. § 823(e)(2) (1980)
 
 
 [30]
 The latter distinction is drawn because, though both teachers and books are likely sources of indoctrination, books can easily be policed for content, while teaching cannot. Here, neither the food nor the food service worker is a likely source of indoctrination
 
 
 [31]
 These positions are, however, unconstitutional on the grounds of political entanglement. See Part IV infra
 
 
 [32]
 The Court in Nyquist expressly stated with respect to buildings that may be used for sectarian purposes that "(i)f the State may not erect buildings in which religious activities are to take place, it may not maintain such buildings or renovate them when they fall into disrepair." 413 U.S. at 777, 93 S.Ct. at 2967
 
 
 [33]
 In particular, the regulation provides that CETA workers may remove asbestos hazards. 20 C.F.R. § 676.71(e)(3)
 
 
 [34]
 The defendants contend that political entanglement can serve only as a "warning signal" of a violation of the Establishment Clause and can never constitute a violation itself. In Committee for Public Education & Religious Liberty v. Nyquist, supra, 413 U.S. 797-98, 93 S.Ct. 2977-2978 (emphasis supplied), the Court indicated that although political divisiveness "may not alone warrant the invalidation" of a law, it certainly was a " 'warning signal' not to be ignored." The Court has yet to strike down a program solely on political entanglement grounds
 The Court has never indicated, however, that political divisiveness cannot invalidate a law. Indeed, the original use of the term "warning signal" and the role political entanglement has played in the Court's analysis indicate that the term cannot be construed as narrowly as defendants wish.
 The term "warning signal" in Establishment Clause cases originated in Lemon v. Kurtzman, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), where the Court struck down two state statutes solely on the basis of excessive entanglement between government and religion both administrative and political entanglement. In a separate section at the end of the opinion, the Court stated that, as well as being "an independent evil against which the Religion Clauses were intended to protect," entanglement constituted a "warning signal" of "an inevitable progression leading to the establishment of state churches and state religion." 403 U.S. at 624-25, 91 S.Ct. at 2116-2117. Thus the "warning signal" was the presence of entanglement generally, not merely political entanglement; entanglement was itself an independent evil; and entanglement served as a warning signal not of a constitutional violation in a particular case, but of an incipient momentum that, if unchecked, would lead to fullblown establishment of religion.
 That political entanglement cannot be merely a warning signal of a particular constitutional violation requiring especially close scrutiny is further indicated by its placement in the Court's analysis. Political entanglement analysis in Lemon as well as in other opinions does not occur at the beginning of the Court's Establishment Clause analysis, where it logically would be if such entanglement were indeed the kind of warning signal defendants see. Instead, such analysis has traditionally been taken up toward the end of the Court's opinions. See Lemon v. Kurtzman, supra, 403 U.S. at 622-24, 91 S.Ct. at 2115-2116; Roemer v. Board of Public Works of Maryland, supra, 426 U.S. at 765-66, 96 S.Ct. at 2353-2354; Meek v. Pittenger, supra, 421 U.S. at 372, 95 S.Ct. at 1766; Committee for Public Education & Religious Liberty v. Nyquist, supra, 413 U.S. at 794-98, 93 S.Ct at 2976-2978; see also Wolman v. Walter, supra, 433 U.S. at 243 n.11, 97 S.Ct. at 2603 n.11; Committee for Public Education & Religious Liberty v. Regan, supra, 100 S.Ct. at 850 n.8.
 
 
 [35]
 Contrary to defendants' contentions, there is a sufficient factual basis to conclude that a serious potential of political divisiveness exists. The Supreme Court has concerned itself with potential political division, not actual political division along religious lines. See Meek v. Pittenger, supra, 421 U.S. at 372, 95 S.Ct. at 1766
 
 
 [36]
 Neither Regan nor Wolman, on which appellants rely, requires a different result. In Regan, the potential for political dispute was infinitesimal because public funding occurred only in the form of reimbursement of actual costs. By contrast, the services of CETA workers are the object of competitive applications of sectarian schools and other potential subgrantees
 In Wolman v. Walter, 433 U.S. 229, 243 n.11, 97 S.Ct. 2593, 2603 n.11, 53 L.Ed.2d 714 (1977), the Court concluded that the provision of uniform diagnostic services on school premises by public employees to all school children, including those in nonpublic schools, did not have a serious potential for political entanglement. The CETA program is different because it does not ensure uniform services to religious and nonreligious institutions alike but instead holds an annual competition for CETA worker services. Thus it is much more likely here than in Wolman that a controversy focusing on religion might develop.
 
 
 [37]
 The evidence showing that the Archdiocese of Milwaukee employed CETA workers both outside their job descriptions and in functions obviously violative of the Constitution provides further support for the part of the district court's injunction prohibiting the placement of CETA workers in that Archdiocese's schools